WILLIAM C. LOFLAND, JAMES T. LANK, HARLAND M. JOSEPH, WILLIAM E. TUNNELL, WILLIAM H. BOOKHAMMER, JOHN R. BAYLIS AND WILLIAM J. THOMPSON,

Defendants below, Appellants,

*vs.*

JOSEPH L. CAHALL, Receiver of Lewes Fisheries Company,

Complainant below, Appellee.

*Supreme Court, on Appeal, Oct. 26, 1922.*

The directors of a corporation are trustees for the stockholders, and their acts are governed by the rules applicable to such a relation, which exact the utmost good faith and fair dealing, especially where their individual interests are concerned.

The directors of a corporation have no right to compensation for services rendered within the scope of their duties, unless authorized by the charter, by-laws, or the stockholders.

The directors of a corporation have no right to compensation for services rendered outside their duties, unless there has been an express contract to pay for such services.

A contract to pay directors compensation for services outside of their duties must be made with persons who have no personal interest in the contract and who are competent to represent the company.

The directors of a corporation have no power to issue capital stock to themselves for services rendered in organizing the corporation and selling stock, unless authorized by the charter, by-laws, or the stockholders, since it is unquestionably the duty of directors to use all reasonable efforts in organizing the company they have undertaken to serve according to the best of their ability, and one duty is to provide for the subscription and payment of the capital stock.

The transaction by which stock is issued by the directors of a corporation to themselves for services rendered in organizing the corporation and and selling stock, where constructively fraudulent, is voidable at the election of the corporation.

While the note of a stock subscriber, given in payment of capital stock issued to him, is not *money paid* within *Constitution, Article* IX, § 3, providing that no stock can be legally issued except for money paid, labor done, or property actually acquired, *quere*, whether it is *property actually acquired.*

Where all the directors of a corporation issued capital stock to themselves as individuals without corporate action, accepted their unsecured notes in payment, concealed the transaction from the other stockholders, and did not give up the notes to the receiver when the assets were delivered into his possession after dissolution, such issuance was not only unlawful, but constructively fraudulent, voidable at the election of the corporation, and the receiver could recover all the profits derived therefrom.

*Revised Code*, 1915, § 1928, providing that, in the absence of fraud in the issuance of capital stock for labor done, the judgment of the directors as to the value of such labor is conclusive, does not apply, where all of the directors issued capital stock to themselves for services rendered and such issuance is voidable at the election of the company.

APPEAL FROM COURT OF CHANCERY. From a decree entered in the Court below in accordance with the opinion reported in 12 *Del. Ch.* 299, an appeal was taken by these appellants. The facts sufficiently appear in the opinion of the Supreme Court.

PENNEWILL, C. J., and RICE, HARRINGTON, and RICHARDS, JJ., sitting.

*David J. Reinhardt, Richard S. Rodney* and *James M. Tunnell,* for the appellants.

*Henry Ridgely* and *George M. Fisher, Jr.,* for the appellee.

PENNEWILL, C. J., delivering the opinion of the Court:

The Lewes Fisheries Company was organized under the General Corporation Law of the State of Delaware (22 *Del. Laws, c.* 394) in January, 1911. Its authorized capital stock was two thousand shares par value one hundred dollars. Its business was the catching of menhaden fish and the manufacture therefrom of fertilizer and oil. It acquired a site at Lewes, Delaware, built a factory and purchased a fishing steamer in the spring of 1911; and in the same year had two other fishing boats built for its use.

Subsequently the company purchased other fishing boats, some of which it afterwards sold, and continued in the operation of its factory and boats from shortly after its organization until September, 1917.

The incorporators of the company were Lofland, Bookhammer and Thompson, three of the appellants, and D. W. Burbage, who is not a party to this suit.

The first directors, elected January 10, 1911, were Lofland, Bookhammer, Baylis, Thompson, Lank, Joseph and Burbage, all of whom continued in office until August, 1912, when Burbage ceased to be a director. From that time, the board consisted of the six members first mentioned until Tunnel was elected in 1916. Thereafter the board consisted of seven directors.

The officers of the company were Lofland, president, Burbage, vice-president, until his retirement from the board, when Bookhammer succeeded him, Lank, secretary, Baylis, treasurer until 1913, when he was succeeded by Thompson, who was followed by Lank, secretary and treasurer during 1916 and 1917. Lofland was also General Manager of the company during its exitence.

Neither the charter nor the by-laws of the company authorized the payment to the directors, of salaries or compensation for services.

All of the directors owned a substantial amount of the capital stock of the company, besides the shares claimed to have been issued to them unlawfully. .

As general manager, Lofland received a salary of one thousand dollars during the year 1911, and eighteen hundred dollars annually thereafter. His duty was to devote his time and attention to the company. Baylis, Thompson and Lank each received a salary of five hundred dollars a year as treasurer, during their respective terms of office.

The directors voted themselves one thousand dollars each for the year 1912 and one thousand dollars each for the year 1913. For 1914 and also for 1915, they received or were credited with the same amount without vote. On December 18, 1917, when winding up the affairs of the company, the directors voted themselves two thousand dollars each, one thousand dollars for 1916, and a

like sum for 1917. The sums so received were paid or credited as salaries or compensation for extra services claimed to have been rendered for the company.

It does not appear from the record that the stockholders authorized, assented to or had knowledge of the action of the directors in paying themselves these amounts. All of the directors received said salaries or compensation, and all were present at the hearing before the Chancellor, but only three testified respecting the payment of the sums mentioned.

On September 18, 1911, the directors issued to themselves ninety shares of stock, full paid and non-assessable, fifteen shares to each, without any money payment therefor. On September 21, 1911, the directors passed a resolution which provided that the directors be voted fifteen shares of stock each for services in organizing the company and commissions for selling its stock.

Dividends were paid on these ninety shares, aggregating sixty per cent. of par, besides a dissolution dividend of one hundred and sixty-five dollars per share, making a total of twenty thousand, two hundred and fifty dollars paid on said shares.

The issuance of this stock was never made known to the stockholders, so far as the record shows, and only three of the directors testified in defense of the issuance of the stock at the hearing before the Chancellor, although all of them were present.

The business of the company was very successful from the beginning, the first season yielding a net profit of twenty-five per cent., and it was decided to increase its capital stock from two thousand to five thousand shares, par value one hundred dollars.

On February 14, 1912, the directors issued seventy shares of stock to each of themselves, four hundred and twenty in all, as full paid and non-assessable, and gave therefor their individual unindorsed promissory notes for the par value of the stock; each giving two notes, one for five thousand dollars due in two years, and one for two thousand dollars payable on demand. The giving of the notes does not appear to have been made known to the other stockholders. The stock was issued and the notes accepted without any corporate action whatever.

Dividends aggregating forty per cent. of par have been paid to the six directors on these four hundred and twenty shares, and

also one hundred and sixty-five dollars per share as a dissolution dividend, making a total of eighty-six thousand, one hundred dollars.

The payments made on said notes were as follows: Each of the six directors paid $766.66 January 20, 1913; $700.00 January 15, 1914; and $221.50 December 19, 1917, a total of $1,688.16 by each director. The aggregate sum paid in cash being ten thousand, one hundred and twenty-nine dollars. Each of these payments was made after a dividend on the stock was received.

The company was voluntarily dissolved in December, 1917.

In June, 1918, a suit in Chancery was instituted against the directors of the company, alleging various fraudulent acts, and praying for the appointment of a receiver. On February 17, 1919, a receiver was appointed, who filed a bill of complaint in the Court of Chancery in July, 1919. On May 12, 1921, the Chancellor rendered a decree in favor of the complainant, requiring, among other things, defendant directors to account for all moneys received from the company either for services as directors or as dividends on the ninety shares, and the four hundred and twenty shares of stock issued to them as aforesaid. A supplemental decree was rendered, June 4, 1921.

Tunnell, one of the defendants, and directors, during the years 1916 and 1917, has paid the receiver since the decree of the Chancellor, the amounts he received as salary or as compensation for services, and the decision of this court cannot, therefore, affect him.

The assignments of error may be stated as follows:

1. The court erred in that it did not determine and adjudge that the ninety shares of the common capital stock of said Lewes Fisheries Company, issued September 18, 1911, fifteen shares to each of said six appellants, was a valid issue of said shares, and that they were fully paid for by said appellants.

2. The court erred in that it did determine that certain moneys voted to the said seven appellants as compensation for services rendered to said Lewes Fisheries Company during the years 1912, 1913, 1914, 1915, 1916 and 1917, were not valid and lawful payments to the said appellants for services rendered.

3. The court erred in that it did not determine and adjudge

that the four hundred and twenty shares of the common capital stock issued February 14, 1912, seventy shares to each of said six appellants, was a valid issue of said shares, and that they were fully paid for by said appellants.

These assignments will be considered in the order in which they were stated.

Neither the charter nor the by-laws of the Lewes Fisheries Company authorized the directors to take salaries or compensation for their services, and, therefore, when they became directors they must have known they were to serve without pay.

All of the six defendants participated in the issuance of the fifteen shares of stock to themselves, and attempted to validate the issue three days later by adopting a resolution directing that they be voted fifteen shares each for services rendered in organizing the company and commissions for selling stock therein.

The appellants claim that by their personal efforts they sold a large amount of stock for the company, and also rendered other valuable services in organizing the company, such as securing a lease of land for the factory, making plans and specifications for the factory and thereby saving the company a large amount of money in architect's fees, supervising the construction of the factory and the boats, and installing machinery, etc. And they further claim that they rendered other extra services, such as going out on the boats frequently to increase catches of fish, obtaining labor at all hours of the day and night, endorsing paper to a large amount, making visits to Milford to hasten the construction of boats, going to Charlestown and other places on business for the company, and also various other services.

In considering the right of directors to receive compensation for services rendered for the company, there are certain general principles of law and equity that should be considered, and which are not, we think, seriously questioned:

1. Directors of a corporation are trustees for the stockholders, and their acts are governed by the rules applicable to such a relation, which exact of them the utmost good faith and fair dealing, especially where their individual interests are concerned.

2. They have no right to compensation for services rendered

within the scope of their duties as directors, unless it is authorized by the charter, by-laws, or the stockholders of the company.

3. They have no right to compensation for services rendered outside their duties as directors unless there had been an express contract to pay for such services, or, as some cases hold, unless the services were clearly outside their duties as directors and performed under circumstances sufficient to show that it was understood by the proper officers, as well as by the directors claiming compensation, that the services were to be paid for by the corporation.

4. A contract to pay compensation for such services must be made with directors, or other proper corporate officers who have no personal interest, directly or indirectly, in the contract, and who are competent to represent the company in the transaction.

These general principles are so well settled, it is not deemed necessary to cite cases to support them. It may be said, however, that some courts have held, that in order that a director may receive compensation for extra services, there must have been an express contract, and others have held that an agreement to pay for such services may be implied. The former is regarded as the strict rule, and is adhered to in a number of jurisdictions, while the latter is termed the more liberal rule, and has been recognized in some states.

Applying these principles to the facts of the present case, it is obvious that the appellants were not entitled to be paid by the company for the services alleged to have been rendered in the organization of the company and the sale of the stock. Most of them bore no relation to the organization of the company, and many were not clearly outside the duties of directors. The resolution of the board provided that the stock should be issued for services rendered in *organizing the company and selling stock;* no other service, therefore, can be considered, in determining the immediate question. It is unquestionably the duty of directors to use all reasonable efforts in organizing the company they have undertaken to serve according to the best of their ability, and one duty is, to provide for the subscription and payment of the capital stock. 6 *Words and Phrases*, 5053; *R. R. Co. v. Ketchum*, 27 *Conn.* 170.

In the Connecticut case, the court said:

"We cannot but think it important in every case, that where a person holding the position of a director, expects or may be fairly entitled to expect a compensation for his services, the services should appear to have been agreed for, or their nature and extent should appear to be such as clearly to imply that both parties understood they were to be paid for, and not rendered gratuitously within the scope of a director's duty.

"Mr. Ketchum, as long as he remained a director, was bound in good faith to make a proper use of his influence to induce persons to take stock in the company, if thereby he could fairly promote the interests of the company.

\* \* \*

"When the resolution was passed the consideration had been executed, for the services compensated by this verdict had been previously rendered, and there is no proof of a precedent or contemporaneous request.  \* \* \*

"We regard it as contrary to all sound policy to allow the director of a corporation, elected to serve without compensation, to recover payment for services performed by him in that capacity, or as incidental to his office. It would be a sad spectacle to see the managers of any corporation ecclesiastical or lay, civil, or eleemosynary, assembling together and parcelling out among themselves the obligations or other property of the corporation in payment of their past services."

Directors may not, in the performance of their duty, be required to use exceptional or extraordinary efforts in the sale of stock, and we are not convinced that such efforts were used by the directors in this case. It is true three of them testified that they sold a very large amount of stock after a broker had sold all he could, but they were unable to tell how much time, even approximately, was required to make the sales, or to whom it was sold, except a few persons who bought five shares each. No witness was produced to whom they had sold any stock. In view of such testimony, given by the directors themselves, and the lack of convincing testimony, it is impossible to believe that they performed, in the sale of stock, anything more than a director's duty. And in respect to all the services alleged to have been rendered in the organization of the company, it is apparent that if they were performed, they did not for the most part pertain to such organization.

It is a reasonable inference from the testimony that the ninety shares were issued purely as a gift, and that "compensation for services," was only a pretense.

The following facts strongly support such an inference:

It was not until three days after the stock was issued that the resolution was adopted which directed that the directors be given fifteen shares each as compensation for services.

The same compensation was given to each of the six directors regardless of the amount of service he rendered. Even if the services were performed as alleged, each director could not have given equal service and been entitled to the same compensation. As a matter of fact, three of the directors did not render any extra service at all, unless the very general statements of the three who testified can be regarded as proof of services rendered by the others who were in court but gave no testimony on this or any other point in the case.

Another fact of some significance is, that many of the extra services the appellants claim to have rendered were clearly within the scope of the duties of the general manager, and presumably should have been performed by him. He was paid an annual salary of eighteen hundred dollars for devoting his time and attention to the affairs of the company, and doing such things as are claimed to have been extra services rendered by all the directors. And, moreover, he also received fifteen shares of stock as compensation for extra services. Certainly he was not entitled to be paid anything more than his salary.

These facts and circumstances necessarily create a feeling of suspicion and doubt in the mind of the court respecting the actual rendition of the alleged extra services, and especially that the stock was issued as compensation therefor. Many of them, if rendered, were, as we have said, not in the organization of the company, some were within the duties of directors, and none were such as the company could reasonably be expected to pay for.

But there is another and stronger reason for holding that the ninety shares were unlawfully issued, and that is, there was no contract, express or implied, on the part of the company to pay for the alleged extra services.

It is not claimed by the appellants that there was any special contract for the payment of compensation for such services, made prior to their rendition, but they insist that the circumstances under which they were rendered show that there was an implied agreement to pay for them. They argue that the services for

which each of them received fiften shares of stock were extra services of which the company received the benefit, and they were entitled to be paid whatever the services were reasonably worth, which was more than the value of the shares received.

But, as we have said, such claim cannot be sustained unless it clearly appears that the services were performed outside their duties, as directors, and under circumstances sufficient to show that it was well understood by the proper officers as well as by the directors claiming compensation, that the services were to be paid for by the corporation.

We are asuming now that the rule, spoken of above as the more liberal rule, is the law.

Applying the test of such rule, we are satisfied there was no implied agreement to pay for the services in question, for the reason that it is not shown there was any understanding by *proper officers* of the corporation that they should be paid for. By *"proper officers"* is meant, of course, such officers as were competent to represent the company in the transaction. It would not mean a board of directors, every member of which claimed compensation for similar service, and every member of which was personally interested in the agreement and the compensation claimed thereunder.

Such is the situation in the present case, and it would be violative of well settled principles of equity applicable to trustees and *cestui que trust* and inconsistent with the fiduciary relation existing between directors and stockholders, to hold that there was an implied agreement on the part of the company to pay the six appellants for the services they claim to have rendered in the organization of the company and in the sale of its capital stock. They were all seeking to promote their own interests rather than the common interests, and attempting to derive a personal advantage by reason of their position, distinct from their co-shareholders. The appellants admit that the transaction was constructively fraudulent.

Our conclusion is, that the appellants, acting as directors, issued to themselves the ninety shares of stock on September 19, 1911, not only without paying for the same as required by the Constitution, but without any consideration at all. They parted

with nothing of value, paid nothing for the stock and had no thought of paying for it. Their act was a pure gift from themselves as directors to themselves as individuals without the consent or knowledge of the other stockholders, and constructively fraudulent. Such being the case, the transaction was voidable at the election of the company.

The second assignment of error raises the question of the legality of the payment or credit by the appellants to each of themselves of the sum of one thousand dollars annually for several years as salaries, or as compensation for services rendered.

Very much of what we have said respecting the first assignment might be repeated here; indeed, the two could have been considered together. The same law is applicable to both, but there is some difference in the facts.

It is not claimed by the appellants that the money payments were made for services rendered in the organization of the company or in the sale of its capital stock, and it is denied that they were made as salaries, although the record shows they were at times so termed by the directors. The claim is, that they were compensation for extra services rendered by the appellants for the company.

The record discloses that most of the services proved were performed in 1911, and that the first payment of one thousand dollars was for the year 1912.

We may assume then that the services for which the money payments were made were rendered after the organization of the company, the securing the site for the factory, the planning, building and equipping of the factory, and all other acts done in the year 1911.

Many of the alleged services rendered by the appellants after that year were not, we think, clearly outside their duties as directors, but even if they were, they were not of such character as to justify the board in paying for them. And certainly they were not rendered under circumstances sufficient to show that it was well understood by competent and disinterested officers of the corporation, as well as by the appellants, that the services were to be paid for by the company. We again note the fact that each appellant received the same compensation, regardless of the

amount of service, or of any service, including the general manager, who was paid an annual salary for his services.

These, and other facts heretofore mentioned, are sufficient in themselves to satisfy the court that "compensation for services rendered," was a mere pretense; probably an afterthought, and that the money payments, made annually for six years to each of the appellants, were intended as pure gratuities.

Inasmuch as the appellants claim that the annual money payments were made as compensation for extra services and not as salaries, and do not contend that they had a right to pay themselves salaries, we can see no reason for discussing that subject.

There can, however, be no doubt that directors of a corporation are incapable of voting themselves salaries unless the right to do so is conferred by the stockholders, by statute or by-laws legally enacted.

This is conceded by all the authorities, and is not denied by the appellants.

The record shows that the compensation or salaries the appelants received or were credited with, were, for some years, voted by the board, and for other years they were paid or credited even without the formality of a resolution or vote.

The court are of the opinion that any money payments made to the appellants, or credits allowed for salaries or as compensation for services, were improperly and illegally made.

We come now to the consideration of the last assignment of error, which raises a more difficult question than either of those already considered, viz.: The legality and effect of the issuance by the appellants to themselves of four hundred and twenty shares of the capital stock of the company, seventy shares to each.

It is not denied that directors have the right to issue stock to themselves. Neither is it denied that the shares in question would have been legally issued if paid for as required by *Section* 3 of *Article* IX of the Constitution of the state, which provides:

"No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation."

The requirement of the Constitution is plain; stock cannot be legally issued except for money *paid*, labor *done* or property *actual-*

*ly acquired.* A promise to pay money does not meet the constitutional requirement. Each of the appellants gave his promissory note payable in the future or on demand, for the par value of the stock issued to him, and even though the maker was solvent and the note good, it was nothing more than a promise to pay. It is so clear that a promise to pay, by note or otherwise, is not payment of money within the meaning of our Constitution, it is not necessary to cite authorities in support of the proposition.

And we do not understand that the appellants question the soundness of this proposition.

Their contention is, that a promissory note is *property*, and when the board accepted it in payment for the stock, the stock was paid for in property "actually acquired."

It is admitted by the appellee that a promissory note is property in a certain sense like other choses in action, and may be regarded as property for certain purposes, but it is denied that it is property within the meaning of said constitutional provision.

In the case of *Washer v. Smyer*, 109 *Tex.* 403, 211 *S. W.* 986, 4 *A. R. L.* 1320, where the constitutional provision involved was practically indentical with ours, the court said:

"It is clear, in our opinion, that the note of a stock subscriber accepted by a corporation in payment for the stock issued him is not to be regarded as 'property actually received' within the meaning of the constitutional provision. In such a transaction the subscriber does not pay anything into the treasury of the corporation. He merely gives the corporation his promise to pay. His indebtedness to the corporation arising from the stock subscription is merely evidenced in a different form. True, it is placed in a negotiable form, but in no actual sense is the liability to the corporation extinguished. It is only differently expressed.   *   *   *

"The real result is that the subscriber has secured an extension of time of payment, and the corporation has received but a postponement of its right to demand payment. The capital stock of a corporation should represent something other than the mere obligations of its subscribers to pay for their stock.

"Undeniably, in the broad sense, a note is property in the hands of the payee.   *   *   *   But the framers of the Constitution never intended that property of that nature should constitute the capital of a corporation. The term 'property' was used in this section of the Constitution in no such sense. It means property readily capable of being applied to the debts of the corporation.   *   *   *

"The integrity of a corporation and the interests of the public demand, however, that the assets of a corporation consist of something more than its stockholder's debts. Its capital cannot .be thus constituted, and, therefore, it cannot accept a stock subscriber's note   *   *   *   for his stock. There is authority opposed to this holding, as there is authority which supports it. But it seems to us no authority is needed to establish it."

But other courts have held differently under similar constitutional provisions. There is, in fact, a conflict in the cases on the question.

In *Mehalin v. Carlson*, 17 *Idaho*, 742, 107 *Pac.* 755, 134 *Am. St. Rep.* 286, it was said:

"It is therein provided that no stock shall be issued except for labor done, services performed, or money or property actually received. The word 'property' includes both real and personal property, and 'personal property' includes money, goods, chattels, things in action, and evidences of debt.   *   *   *   Said promissory note was actually received by the corporation and was a thing in action or evidence of debt. That note was an asset of the bank, and it appears that the bank had the authority to issue the stock."

While it may be true, as claimed by the appellee, that a promissory note is not property "actually acquired," we are not required to say, that in no case can a promissory note be so regarded. But we are clearly of the opinion that all the directors of a corporation cannot issue stock to themselves, accept their own promissory notes in payment therefor, conceal the transaction from the other stockholders, and be regarded in equity as the legal holders of the stock. Such are the facts which distinguish the present case from any cited by the appellants.

No authority has been cited, nor can there be, we think, which holds that stock so issued was lawfully issued, valid in the hands of the holder and unavoidable by the company.

It is urged by the appellants, that even if the stock they issued to themselves was not paid for by services or notes, they should not be required to pay to the company the dividends received, because the issuance of the stock was not void.

It is insisted that all they should be required to do is to pay to the company their notes or par value of the stock. They argue that if nothing had been given for the stock other than a subscription, all that could be exacted would be the par value of the stock,

and if the notes were only a promise to pay, they were more than a subscription.

In most of the cases cited by the appellants, there were disinterested directors, or other officers, who were legally capable of representing the company. In this case the appellants constituted the entire board and every officer of the corporation. They were all personally interested in the issuance of the stock in question, each received the same number of shares and gave similar notes in payment. There was not one disinterested director or officer to represent the company in the transaction. They gave their notes for the stock issued by themselves to themselves, without any thought or intention of paying the notes, except from salaries, services and dividends; and mainly from salaries or services, which they must have known they were not entitled to receive. We hold that the stock was unlawfully issued because the appellants who issued it and accepted their notes in payment, were personally interested in the transaction and incompetent to represent the company. Moreover, the stock was issued and the notes accepted without any corporate action by resolution or otherwise, and the character of the transaction and real intention of the appellants is further evidenced by the fact that the transaction was concealed from other stockholders, and the notes not given up to the receiver when the assets of the company were delivered into his possession by direction of the Chancellor.

The case of *Du Pont v. Ball*, 11 *Del. Ch.* 430, 106 *Atl.* 39, 7 *A. L. R.* 955, decided by this court a few years ago, was commented on by counsel on both sides, and relied on largely by the appellants in support of their contention, that stock issued by directors to themselves as full paid and non-assessable, but without being paid for is not only not void, but good and valid in the hands of the holders.

The court did decide in that case, that the issuance of such stock, while unauthorized and unlawful, was not void. The act held to be *ultra vires* and void was the agreement that the stock was full paid and non-assessable. The decision of the court went to that extent and no further.

We fail to see how that case can have any bearing on the questions raised here. The appellee does not claim that the stock

issue in the present case was void, but insists that the holders, the appellants, cannot, under well settled principles of equity, profit thereby, because they issued the stock to themselves unlawfully, in violation of their duties of directors, and in fraud of co-shareholders.

It was held in the *Du Pont Case,* under *Section* 1934, *Revised Code,* that where stock is issued by directors to themselves without being paid for, and the company becomes insolvent, the holders may be assessed to the par value of their stock for the payment of creditors' claims.

It was held by the Court of Chancery in the case of *Scully v. Automobile Finance Co.,* 109 *Atl.* 49, under *Section* 1935, *Revised Code,* that where the company is solvent, the holders of such stock may be similarly assessed by the directors, if the business of the company requires it.

But in neither of those cases had there been paid to the holders of the stock any dividends, and the question whether they could be required to surrender their stock and account to the company for all dividends received, was not involved.

The actions were not brought for the purpose of avoiding the stock issue and compelling the return of dividends; and there is nothing in the opinion of the court to indicate that directors of a corporation can legally derive any profit or advantage from their breach of trust, official misconduct or unlawful act, actually or constructively fraudulent.

The present action was brought in the court below by the receiver of the company to compel the return of dividends or profits, and the cancellation of the stock certificates, because the issuance of the stock was fraudulent and voidable.

The duties and liabilities of directors of a corporation with respect to the purchase of stock therein are well stated in the case of *Du Pont v. Du Pont,* (*D. C.*) 242 *Fed.* 98, as follows:

"The duties of a director or other officer of a corporation in transactions where he is representing his company are governed by well-established and familiar rules of equity. A director of a corporation may freely purchase its stock, and occupies no relation of trust to an individual stockholder which prohibits his using whatever advantage his position may afford him through knowledge of its business and condition superior to that of the stockholder with whom he deals. He is not accountable to the stockholder for with-

holding information from him which affects the value of the stock, but to the corporation, the whole body of stockholders, he stands in a fiduciary relation which requires him to exercise the utmost good faith in managing the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot directly or indirectly derive any personal benefit or advantage by reason of his position distinct from the co-shareholders. By assuming the office, he undertakes to give his best judgment in the interest of the corporation in all matters in which he is acting for it untrammeled by hostile interest in himself or others. If he acts for himself in matters where his interest conflicts with his duty, the law holds the transaction constructively fraudulent and voidable at the election of the corporation. He is disqualified by the intervention of a personal interest to act in the performance of his duties as trustee for the company, and is not permitted to obtain title to property where he has any duty to perform which is inconsistent with the character of a purchaser on his own account. When a director attempts in violation of his duty to acquire interests adverse to the corporation in respect to any matter involved in the confidence which has been reposed in him, as to which equity imposes a disability upon him to deal in his own behalf, the court will hold him as a trustee for the corporation, and he must account for the profits which otherwise would have accrued to the corporation. The product of the transaction will belong to the corporation exclusively."

Applying these rules to the present case, we are constrained to hold that the issuance of the four hundred and twenty shares by the appellants, acting as directors, to themselves as individuals, was not only unlawful, but constructively fraudulent, and that the profits derived therefrom, the product of the transaction, must be returned to the company. There can be no doubt about the law applicable to the facts of this case, and we feel that the above mentioned familiar and wholesome principle of equity cannot be disregarded, viz.:

A director will be held as a trustee for the corporation he has undertaken to represent, and must account for the profits resulting from an unlawful act done to promote his own interest, because he cannot derive any personal benefit or advantage by reason of his position distinct from other stockholders.

The appellants admit that the issuance of the ninety shares of stock to themselves for services was constructively fraudulent because there was no one competent to value their service, meaning, of course, no one personally disinterested. But they contend that the valuation and issuance cannot be voided for constructive fraud because it is provided by *Section* 1928 of the *Revised Code,* that—

"In the absence of actual fraud in the transaction, the judgment of the directors, as to the value of such labor, property, real estate or leases, shall be conclusive."

But it is obvious that by "directors", the Legislature meant officers who were competent to represent the company in making the valuation, and not those who were personally interested in the valuation, and, therefore, wholly incompetent to represent the company in the transaction.

If the issuance of the ninety shares was constructively fraudulent because there was no officer of the company personally disinterested, and competent to value the services for which the stock was issued, the issuance of the four hundred and twenty shares must have been also constructively fraudulent, for there was no officer competent to determine the value of the notes for which the stock was issued.

If the transaction in either case was fraudulent, it was voidable at the election of the company.

We have not thought it necessary, under our view of the case, to discuss or even refer to many of the authorities cited by counsel. Such discussion would unduly and unnecessarily extend this opinion.

The leading cases cited in the briefs, were considered by the Chancellor, and reference thereto may be found in his opinion delivered in the court below.

While the court have been compelled to decide against the appellants because of certain unlawful acts, it is proper and just to say, that they performed many acts, as directors, that were of much benefit to the stockholders. The remarkable success of the company was due very largely to their efforts, and it is unfortunate that some of their acts were illegal.

It was strongly urged at the argument that an affirmance of the Chancellor's decree would work a great and undeserved hardship on the appellants, but we think the hardship is more apparent than real. They were clearly not entitled to salaries or compensation for extra services claimed to have been rendered, for all payments made to them on such account were gifts purely. They paid nothing for the stock, the dividends on which they must return to the company, except the sum of ten thousand one hundred and twenty-nine dollars which they will receive credit for. They have

advanced no money that will not be returned, and will sustain no loss except in profits, represented by dividends which they were not entitled to receive.

We find no error in the decree of the court below.