RICE AND HUTCHINS INCORPORATED, a corporation organized and existing under the laws of the State of Maine,

*vs.*

TRIPLEX SHOE COMPANY, a corporation organized and existing under the laws of the State of Delaware, L. E. DILLMAN, JOHN A. CURTIS, HARRY MILLER, L. T. RIDER, ALBERT W. DILLMAN, HARRY L. RICE, FRED B. RICE, FRANK B. ELLISON, and PHILIP MULVIHILL.

*New Castle, July* 10, 1929.

300

302

*Charles C. Keedy*, for petitioner.

*Josiah Marvel*, of the firm of Marvel, Morford & Ward, for L. E. Dillman, John A. Curtis, Harry Miller, L. T. Rider, Albert W. Dillman ("B" ticket), and Triplex Shoe Company.

*Robert H. Richards*, for Harry T. Rice, Fred B. Rice, Frank D. Ellison, and Philip Mulvihill, who with Albert W. Dillman were on the "A" ticket.

THE CHANCELLOR. At the annual stockholders' meeting which the petition calls up for review, the petitioner challenged the right of certain shares of common stock to vote. From the stock register which is in evidence it appears that there are outstanding nine hundred and forty-three alleged shares of no par common stock and about fifteen hundred and sixty shares of preferred stock. Of the nine hundred and forty-three shares of common all were represented at the annual stockholders' meeting either in person or by proxy, and of the preferred stock the petitioner's eleven hundred and forty-nine shares were present and claimed the sole right to vote, notwithstanding the provision

in the amendment to the certificate of incorporation, filed January 2, 1922, that "the sole voting power shall reside in the holders of the common stock."

Before taking up the questions which call for decision, it will perhaps be helpful to point out certain respects wherein the organizers and managers of this corporation clearly disregarded the law of its creation. From its inception, the bungling results of ignorance of the law have marred its features. In fairness to the solicitor appearing for it in this cause it should be stated, however, that he is in no wise identified with these results.

I now proceed to point out the particulars wherein the statute under which the corporation was created was completely disregarded.

In the original certificate of incorporation two classes of stock were created—a preferred with a par value, and a common with no par value. The preferred was simply called such; any description of preferences, however, was omitted. The word "preferred" therefore meant nothing. *Gaskill v. Gladys Belle Oil Co., ante p.* 289, 146 *A.* 337. The no par common shares were described as "the remaining seventy-five thousand dollars" of the capital. This was absurd. The statute then in force was as now very plain in its requirement that if no par stock is to be issued the certificate "with respect to such stock * * * shall state the total number of shares authorized and that they are without nominal or par value, and the number of shares with which it will commence business, which shall not be less than ten shares." How many shares of no par common, "the remaining seventy-five thousand dollars" of capital was meant to designate, no person can tell.

In the next place, the statute was quite clear in its provision that no par common stock is to be issued for a consideration fixed by a two-thirds vote of the stockholders of each class entitled to vote, unless the certificate of incorporation confers the power to fix the consideration upon the board of directors. This certificate gave no power to the directors, and therefore the no par stock could be issued only upon a consideration fixed by the stockholders. Notwithstanding this statutory provision, the directors proceeded at their first meeting to authorize the issuance to

themselves of five hundred and forty shares of no par stock. Their action was absolutely without authority in the law.

Not only so, but even if the power had been conferred on the directors to fix the consideration for the issuance of the no par stock as they assumed, yet in attempting to exercise that power, they disregarded the law in that they regarded the services of the Dillmans and Solly as a lawful consideration for the issuance of full paid, non-assessable stock. Some of these services were past, those that had to do with the organization of the company; but for the most part, the services accepted in payment for the stock were to be rendered in the future. There is nothing in the evidence which, according to the tests laid down by the Supreme Court of this State in *Lofland, et al., v. Cahall, Receiver*, 13 *Del. Ch.* 384, 118 *A*. 1, and by this court in *Bowen v. Imperial Theatres, Inc.*, 13 *Del. Ch.* 120, 115 *A*. 918, would justify the recognition of such services as a lawful consideration for the issuance of full-paid non-assessable stock.

The foregoing constitute the most glaring errors which were committed by those responsible for the corporation's management.

The corporation went along for over a year before it was discovered that the original certificate of incorporation was defective with respect to its capital stock provisions. Steps were then taken to correct the defects. At a stockholders' meeting held February 28, 1921, the certificate was authorized to be amended. The no par common stock that had theretofore been issued was voted at that meeting in favor of the amendment. Such stock had no right to vote. In legal contemplation it was not stock in any sense of the word, for it purported to be outstanding by authority of the provision in the charter that seventy-five thousand dollars of capital should be composed of no par stock, a provision that was meaningless as before pointed out. The only stock then outstanding was the original "preferred." That stock was in all essentials ordinary common stock, no preferences having been affixed to it and no voting restrictions having been imposed upon it. The amendment to the certificate of incorporation is stated to have been voted for by all the then outstanding preferred stock as well as by all the then outstanding pseudo common stock.

There is something peculiar about the statement of the vote for the resolution of amendment. The original minutes do not state the number of shares voted in its favor—the entry is "by a unanimous vote," the kind of stock which was voted not being disclosed. An inspection of the proxies in evidence attached to the pages where the minutes are recorded in the re-written minute book shows proxies from common stockholders only. But the re-written minutes state that all the common stock, viz., seven hundred and fifty shares, and all the preferred stock, viz., seven hundred and fifty shares then outstanding, voted for the resolution. As many as seven hundred and fifty shares of preferred stock do not, however, appear to have been outstanding at that time. Another peculiar feature of the amending proceedings is that in the resolution of the directors recommending the amendment, according to the original minutes of directors' meetings, as well as according to the notices set out in the re-written minutes of the stockholders' meeting, the number of proposed no par shares to be authorized was stated to be three hundred and twenty-five. According to the original minutes of the stockholders' meeting the resolution fixing the number of three hundred and twenty-five as recommended by the directors was adopted. According to the re-written minutes, however, notwithstanding the notice to the stockholders stated the directors' recommendation to be that the no par common shares should be three hundred and twenty-five in number, the resolution adopted by the stockholders fixed the number at ten hundred and seventy-five.

I shall not pause to consider the deductions to be drawn from the foregoing confusion as disclosed in the various minutes. For the purposes of this case I shall assume that the amendment to the certificate was recommended by the directors and voted on in the form filed in the office of the Secretary of State, and that the preferred stock voted in favor thereof. On this assumption, which is made only for the present purposes, the vote given in its favor by the preferred stock alone made it a valid amendment. Thereupon, the authorized common stock for the first time was correctly described in terms of shares, with sole voting power, and the preferred stock was given appropriate preferences.

Why the amendment thus authorized should not have been

filed with the Secretary of State for nearly a year after its authorization is not explained. I suspect that the necessity for a further patching up of the situation made the delay advisable. Those who had charge of the corporation proceeded correctly upon the theory that the amendment was not a part of the corporate charter until it was filed in January, 1922, for in the interval they continued to issue more of the original preferred and common stock. The petitioner acquired its original block of both common and preferred during this interval, viz., on April 5, 1921, its certificates being in the old form.

After the amendment was filed and the capital structure thereby re-built, all outstanding stock was called in for exchange. All the stockholders, including the petitioner, turned in their old certificates and received therefor new certificates for the appropriate number of shares, common and preferred, which they had theretofore held, the new certificates containing on their face a statement of the relative rights belonging to the two classes as the same were defined in the amendment of February 28, 1921, filed in January, 1922.

Now could this exchange of old for new certificates have the effect of validating all the stock then outstanding? I think not. If any avoiding vice was inherent in any of the stock outstanding prior to the exchange, it is difficult to see how the mere giving of new certificates could cure such stock's invalidity, unless possibly the flaw was such as stockholders could repair by mutual agreement or consent. It is contended by the defendants that such agreement or consent was in substance obtained in this case—at least that the petitioner manifested such consent. The evidence to sustain this contention is this—that the petitioner has been repeatedly represented by proxy at all subsequent meetings of the stockholders, voted the common stock it held, had a representative on the board of directors for several years, and never until recently questioned the right of any of the common stock to vote. There is no evidence which contradicts that adduced by the petitioner to the effect that it never had knowledge of the facts upon which its present contentions touching the invalidity of the common stock are based, until just preceding the annual meeting now under review, and that as soon as it

became advised thereof objection to the validity of the common stock and its right to vote was presented by it and overruled by those conducting the meeting. This court in *Cahall, Receiver, v. Lofland, et al.*, 12 *Del. Ch.* 299, 114 *A.* 224, refused to hold that stockholders had ratified illegal acts of directors where they had no knowledge of the acts claimed to have been ratified. "One cannot ratify that which he does not know," said the Chancellor. The court further refused to attach to stockholders knowledge which they might have obtained from books that were present and available to them, but which they did not examine. This ruling seems to be pertinent here. If from the time the petitioner came into this corporation it assumed that everything theretofore done was regular and proper and accordingly refrained from making an examination into the corporation's past history, I do not see how it would be proper to charge it with culpable negligence in pursuing that course. Accordingly, I refuse to fasten upon it the knowledge which such an examination, if made, would have revealed.

There is another piece of evidence which is referred to as supporting the theory of ratification by the petitioner of the issuance of that part of the common stock which went to the Dillmans and Solly—the five hundred and forty shares which, if allowed to vote, would, the preferred stock not voting, control the corporation. I refer to the resolution adopted at the annual stockholders' meeting of January 24, 1922, appearing *supra*, in the statement of facts, by which the issuance of the stock to the Dillmans and Solly was approved. The petitioner gave a proxy to the Dillmans and Solly to vote their stock at that meeting. According to one set of minutes the resolution was adopted; according to another, it was not adopted. The genuineness of each set of minutes is supported by testimony.

The first question to be answered in this connection is— which set of minutes is correct, the one recording the adoption of the resolution or the one failing to record the adoption? This is a controverted question of fact. I resolve it against the minutes which purport to show the resolution's adoption. This is for the following reasons: (a) The minutes rejected are not the original; they are a re-write of the signed original; and (b) the entire

minute book seems to have been re-written and there are evidences, which I shall not pause to refer to, that strongly indicate a tampering with the original so as to make other things appear to have been done which were not in fact done. This fact serves to cast serious doubt upon the verity of the re-written minutes.

But even if the resolution referred to had been adopted, it would not be reasonable to hold the petitioner bound thereby. This is for the following reason: The individuals named as the petitioner's attorneys to act in its behalf were themselves the very individuals who were to be benefited by the resolution they were voting for. The petitioner had no notice that the subject-matter of the resolution would be considered. It would be flying in the face of the simplest conception of justice to say that an agent could, without informing his principal, use the authority of his agency to commit the principal to an act done by the agent solely in his own peculiar personal interest. Inasmuch as the old stock for which the new certificates were authorized by the resolution to be issued, was issued without consideration to the individuals who became the proxies or agents of the petitioner, the action of the proxies in voting the new certificates to themselves in exchange for the old meets with the same objection in principle as was held by the Supreme Court in *Lofland, et al., v. Cahall*, 13 *Del. Ch.* 384, 118 *A.* 1, to vitiate the action of directors whereby they took money and stock from the corporation on the sole authority of their own votes. A person acting as proxy for another is but the latter's agent and owes to the latter the duty of acting in strict accord with those requirements of a fiduciary relationship which inhere in the conception of agency. If directors who are the agents of the stockholders are invested with a fiduciary character which inhibits them from passing judgment where their own peculiarly personal interests are involved, as was held in the *Lofland Case*, I am unable to see why on principle the same sort of inhibition is not imposed on those who act as proxies for a stockholder. The observations just made are of course made on the supposition that the only possible objection to the issuance of the new certificates consists in the want of consideration underlying the original issue. That other objections exist, is apparent not only from what has already been

said with respect to the failure of the evidence to convince the court of the adoption of the resolution of February 28, 1921, but as well from what ensues in the course of this opinion.

So much then for the suggestion that whatever may have been done, the petitioner is not in a position, by reason of consent or ratifications, to make complaint against it.

Having thus removed from the case the suggestion of ratification as an obstacle to the petitioner, I now proceed to examine certain other of its aspects.

The petitioner contends that the common stock acquired by the Dillmans and Solly, a voting control, even if there was power in the corporation to issue it, nevertheless is not validly outstanding for the reason that no lawful consideration was given therefor, and therefore, should not have been allowed to vote. I have before stated that the consideration given was not of such quality as would satisfy the requirements of our constitution and statutes. But that that circumstance should be allowed any weight in altering the results of the meeting as argued by the petitioner is very doubtful in view of the fact that, if the common stock of the Dillmans and of Solly should not have been allowed to vote because issued without consideration, neither, it may be argued, should the common stock of the petitioner, for that stock is conceded likewise to have been issued without consideration. In that event, the few remaining shares of common held by other parties which voted in favor of the successful "B" ticket would be sufficient to carry it, unless indeed that stock was given without consideration, a fact which the evidence is silent upon and therefore cannot be found as true. Thus, if the result of the present petition were left to turn on whether or not certain common stock should vote which was given for no consideration whatever, the petitioner would be out of court. It might be said that under the pleadings the status of the petitioner's stock in so far, I mean, as the matter of its having been issued without any consideration is concerned cannot be inquired into, because the pleadings make no issue upon the point. But if the outcome were to be determined upon a pure question of pleading, the court would indicate a willingness to entertain a motion to amend, especially since it

would seem manifest that another contention raised by the petitioner must be faced and answered in the end.

Accordingly, inasmuch as the other contention has been argued and apparently must be settled at some time or other before the internal conflicts of this corporation are on the way to a termination, it becomes necessary to proceed with an examination of the petitioner's further contention, laying aside the merits of the one just mentioned as unnecessary to be disposed of.

This further contention is that none of the common stock can vote and that the preferred stock at present is the only stock qualified to vote notwithstanding the language of the charter as amended by the amendment of February 28, 1921, to the effect that the sole voting power is reposed in the common stock. This contention has two aspects—first, can the common stock vote, and second, if not, can the preferred?

First, then, can the common stock vote? The petitioner contends not, because the corporation, even though it be conceded that it always had power to issue common stock, had no power to do so except in obedience to the act under which it was incorporated. I have hereinbefore pointed out how the corporation in assuming to issue common stock absolutely disregarded the law of its creation. Of course originally, as before stated, there was not any no par common stock recognizable by the law as authorized to be issued. But by the amendment which we are assuming was adopted on February 28, 1921, a lawful no par common stock was authorized to be issued. All the present outstanding no par common must trace its lawful origin to the amendment of the certificate. (There was another amendment filed April 27, 1922, that dealt with the capital structure. But I conceive that everything said about the amendment adopted in February, 1921, may likewise be said about the one of April, 1922, and hence to avoid too great detail no special notice has been taken of the latter.)

It was just stated that all the present outstanding no par stock must trace its lawful origin to the amendment of the certificate adopted February 28, 1921, and of course to the statutory provisions applicable to the corporation's power to function thereunder. The power to issue stock must rest upon an authority

conferred by the law of the corporation's existence. With respect to no par stock, the law (then *Section 4a* [*Revised Code* 1915, § 1918*A*, as added by 29 *Del. Laws*, *c.* 113, § 3]), provided that it may be issued from time to time for such consideration as may be fixed by the directors if authority be conferred upon them in the certificate of incorporation or, in the absence of such authority, then by consent of two-thirds of each class of stock entitled to vote. This section of the law is to be construed in harmony with *Section* 21 of the act (*Revised Code* 1915, § 1935, as amended by 29 *Del. Laws*, *c.* 113, § 11), which confers on the directors power to issue the unissued stock up to the amount authorized in the certificate and to determine in what amounts and at what times payments for the stock shall be made.

Reading these two sections together, it would seem clear that with respect to no par stock there are at least two functions to be performed in connection with its issuance. One is the fixing of the consideration for which it shall be issued and the other is the determination of when it shall be issued. *Section* 14 (*Corporation Law* 1929). The former function is to be performed by the stockholders in such cases as the instant one where the charter does not confer power upon the directors; and the other function is to be performed by the directors. Now in this case the stockholders never determined what the consideration should be for the issuance of the no par stock. The *sine qua non*, therefore, for the exercise of the power of the directors to issue stock under *Section* 21, *supra*, never existed. Yet the directors assumed to issue the stock. There was no authority whatever in them to do so. I see no escape from the conclusion that all the common stock assumed to be issued for this corporation was totally without any warrant in the law and must therefore be regarded as not outstanding. This conclusion may seem to be, as it doubtless is, a rather severe one to draw especially if there are any holders of the common stock who have paid value for their holdings. They no doubt have their remedy, however, in demanding and securing a repayment of the values paid for the stock. However that may be, I do not see how the common stock can be recognized as lawfully outstanding unless the requirements of the statute and its directions as to authority are to be completely ignored.

The solicitor for the petitioner contends that the no par common stock which was issued under the circumstances above detailed must be regarded as analogous to stock which has been issued in an amount in excess of that authorized by the charter, that such over-issue of stock is void and being so its issuance is incapable of ratification. In this connection the case of *Pruitt v. Oklahoma Steam Baking Co.*, 39 *Okl.* 509, 135 *P.* 730, is cited. I doubt, however, the analogy of this case to one like the Oklahoma case involving an over-issue, for here, after the amendment authorized on February 28, 1921, there was a lawful manner for the common stock to be issued, whereas in the case of an over-issue there could be no way whatever under the law for the stock to be lawfully put out. If facts existed in this case from which a ratification of the common stock's issuance could be found, it would be necessary to proceed to consider whether or not the situation is one which ratification could validate. There being no evidence, however, from which to conclude that ratification was agreed to, it becomes unnecessary to proceed to consider that point.

I conclude therefore that the no par common stock cannot be recognized as outstanding. It follows that none of it was entitled to vote at the annual stockholders' meeting here under review.

The next question is—could the preferred stock vote at that meeting? The preferred stock has a par value of one hundred dollars per share. It is generally assumed by the bar of this State that unless a preferred stock is denied the right to vote in the certificate of incorporation, it has such right. *Morris, et al., v. American Public Utilities Co.*, 14 *Del. Ch.* 136, 122 *A.* 696. In the amended certificate of incorporation, there is a provision that "the sole voting power shall reside in the holders of the common stock." From this provision it is argued that in no event could the votes of preferred stock be received at an annual stockholders' meeting for the election of directors. This corporation has a charter, is in active existence, has assets of considerable value and is doing a thriving business. The petitioner alone has invested well over one hundred thousand dollars in it. Yet, there being no common stock that can vote, and if the preferred stock cannot vote, the stockholders are without power to function and

no one can have authority to direct its affairs except as *de facto* officers. Those who happen now to be in control of its operations would enjoy the rights of squatter sovereignty in perpetuity, with no power in the corporation's only lawfully recognized stockholders to remove them. Since all corporations are but the fictitious *alter ego* of the corporate membership, it would be an anomalous situation if among those whom the law recognizes as being the owners of the corporate creature none could express a voice in its management and ultimate control. This would be so absurd, that if any sensible interpretation can be given to the words defining the voting rights of stock which would avoid it, such interpretation should unhesitatingly be accepted. Such an interpretation can be given in this case. When this amended certificate of incorporation provided that the no par common stock shall have the sole voting power, it must necessarily be interpreted to mean that the implied denial of power in the preferred stock to vote is operative only when no par common is issued and lawfully outstanding. Until the stock which is vested with exclusive voting power is lawfully outstanding, reason as well as the necessity of the case suggests that the outstanding preferred stock should exercise the normal right to vote which generally inheres in corporate stocks.

I conclude therefore that until no par common stock is outstanding, the preferred stock of this corporation is entitled to vote at stockholders' meetings.

The managers of the meeting under review should not have received the votes of the so-called no par common stock for the reasons before stated, and should have received the votes of the preferred stock. Had this course been pursued the names presented on the "A" ticket would have been declared elected instead of those presented on the "B" ticket. The decree will be that those whose names appeared on the "A" ticket be declared to have been elected directors at the meeting in question.

Note. From the decree entered in conformity with the foregoing opinion, an appeal was taken and the decree of the Chancellor affirmed. The opinion of the Supreme Court will appear in 17 Delaware Chancery Reports. See also 152 Atl. 342.