### GELLER v. TRANSAMERICA CORPORATION.

Civil Action No. 322.

District Court, D. Delaware.

Dec. 31, 1943.

John Van Brunt, Jr. (of Hastings, Stockly & Layton), of Wilmington, Del., for plaintiff.

Edwin D. Steel, Jr. (of Morris, Steel & Nichols), of Wilmington, Del., for defendant.

LEAHY, District Judge.

Plaintiff says he was induced to sell his Class A stock as a result of acts of misrepresentation and concealment by defendant,[1] at a time when defendant, inasmuch as it was the majority stockholder of Axton-Fisher, stood in a position of a fiduciary to plaintiff as a minority stockholder. I shall treat seriatim the acts of misrepresentation and concealment before discussing the apposite law as to whether a fiduciary relation exists here.

1. Misrepresentation and Concealment

I. *The offer of defendant contained in its letter of November 12, 1942.* This is the sole communication that ever passed from defendant to plaintiff. It was a general letter addressed to all holders of both Class A and Class B stock. It is a mere offer by defendant to purchase Class A stock for $40 a share and Class B for $12 a share.[2] This letter expressly invited inquiry concerning the offer made to the holders of the stock.[3] Plaintiff and his investment counsel made no inquiry of any kind. Axton-Fisher's letter of February 27, 1942 (to be discussed in detail infra) informed all its stockholders that defendant had purchased a majority of its Class B stock. And in May, 1942, defendant had announced its policy to acquire Axton-Fisher securities. I am unable to understand why plaintiff or his investment counsel made no inquiry of defendant of the present status of Axton-Fisher, prior to December 5, 1942, when plaintiff sold his stock for $40 a share, when plaintiff knew—at least the information was available to his investment counsel—two important facts which the ordinary seller always wants to know, i. e., that the book liquidating value of the Class B stock was $86.42 and that defendant had for practically a year put on a steady campaign to acquire all of such shares. For the moment, at least, I fail to see how plaintiff can argue there was anything false or misleading in the November 12, 1942, letter.

II. *Axton-Fisher's filing with the SEC.* Axton-Fisher filed a registration statement with the SEC in February 1942, which it abandoned in May 1942. A proposed plan of recapitalization was being considered,[4] which looked to a cash payment of accrued dividends on the preferred and Class A stock from funds to be procured from defendant who was to purchase certain new prior preferred stock to yield to Axton-Fisher $971,300. The proposed recapitalization was subject to several conditions, among which were certain amendments to Axton-Fisher's charter and an exchange acceptance from the holders of at least two-thirds of the preferred and Class A stock by April 10, 1942. On March 23, 1942, the SEC declared the registration statement had to be amended in certain particulars. The statement and plan of recapitalization were abandoned when defendant refused to continue its commitment. One of the charges of misrepresentation is here involved.

Plaintiff charges that defendant "caused" Axton-Fisher to issue a press release on May 7, 1942, announcing the abandonment of the plan, which, in part, stated: "In view of the changed conditions and a considerable decline in the market prices of preferred stocks since the commitment was originally made, Transamerica Corporation [defendant] advised the Company that it did not feel

[1] Plaintiff did not personally attend to his stock purchases and sales but relied entirely upon the advice and counsel of Alexander Guttman, a stocktrader and arbitrageour—a person consequently presumed to have expert knowledge in the investment field.

[2] The Class A stock was traded in on the New York Curb Exchange. During 1941 and 1942, the highest price at which it sold was 37½. In November 1942, when defendant made its offer, the range was between 30 and 36½.

[3] The significant portion of the letter reads: "Any inquiries regarding the offer may be addressed to us."

[4] Axton-Fisher's outstanding shares as of February 1942 were: (a) 6% cumulative preferred of $100 par; (b) Class A common par $10, entitled to cumulative dividends of $3.20 after payment of the preferred dividend; after the Class B had received a $1.60 dividend, to share equally with Class B as to dividends; and redeemable at $60 plus accrued unpaid dividends; and (c) Class B common, the junior stock.

By 1942 preferred's dividend arrearage charge amounted to $243,846; Class A's amounted to $727,440.

justified in making any further commitment." From this plaintiff claims that he, as well as his investment counsel, were lead to believe "that conditions had changed for the worse in the business affairs of Axton-Fisher". There is a short answer to this contention. First, the press release said nothing about the affairs of Axton-Fisher. Second, it merely said that because of "changed conditions" [5] and the decline in the price of preferred stocks generally, it would not extend its commitment.

■ A representation must be examined as to its ordinary meaning and in the light of the circumstances in which it is made. Any reference manual will show the effect of the war, during the Spring of 1942, on preferred stocks. I conclude that plaintiff's interpretation of the press release of May 7, 1942, lacks plausibility.

III. *Axton-Fisher's press release of November 13, 1942.* Plaintiff charges that Axton-Fisher issued a certain press release—denominated by the newsmen as a "hand-out"—which was printed in various metropolitan newspapers and financial periodicals relating to the offer of defendant to purchase Class A stock. The news item reported that defendant owned no Class A stock when, in fact, up to September 1942 it had purchased and owned 16,272 shares of Class A stock. There is nothing to show that this inaccuracy was of defendant's making, especially in the light of the fact that on May 7, 1942, when it announced its abandonment of the plan of recapitalization, defendant issued its own press release which, in part, stated that defendant "Transamerica Corporation * * * has advised that it will feel free to buy or sell or otherwise trade in the various issues of the company's [Axton-Fisher's] outstanding securities if its judgment should in the future dictate such action." Following this announcement of its desire to acquire the securities of Axton-Fisher, defendant commencing on August 14, 1942, acquired 5,232 or 10% of the Class A stock. As this stock was listed on the New York Curb Exchange, thereafter defendant, under the Securities Exchange Act of 1934, was required and did, in fact, report to the SEC every subsequent purchase. These apparently bona fide acts do not square with holding defendant responsible for an act done by an officer of Axton-Fisher, even if it be assumed that such officer gave the "hand-out" with evil design, and especially where the pleadings and affidavits fail to show any authority on his part to bind defendant.

IV. *Axton-Fisher's letter of February 27, 1942.* The letter enclosed Axton-Fisher's annual report for the year 1941. Plaintiff's claim is that this communication contained only a partial truth when it stated the company's business was declining, for in fact it had increased its sales of its second largest product—"Spuds" cigarettes. Here, again, an act, without pausing to test its taint of illegality, of Axton-Fisher is charged up to defendant, at a time long before defendant acquired control of that company. However, the uncontradicted facts shown in the affidavits disclose that profits from the sale of Spuds during the first six months of 1942, were offset by substantial losses on this brand for the corresponding period in 1943. In any event, the statements in the affidavits filed by defendant's officers, viz., that they were unaware that this letter of Axton-Fisher had been sent, stands uncontradicted. Moreover, it is difficult to accept plaintiff's construction of that letter in view of the fact that after he read the letter he went out within two weeks and purchased additional shares of Class A stock.

V. *Plaintiff's lack of knowledge of Axton-Fisher's earnings.* Plaintiff contends that if he had known that the company's earnings were in excess of $800,000 he would not have sold his 240 shares. The uncontradicted facts show that the company's operating profit for 1942, before taxes, was $582,955.65, $398,000 of which was earned in the last quarter. The first six months of 1943 show an operating loss of $128,217.13. It can be readily seen, then, why defendant made no representations or predictions as to Axton-Fisher's business when it made its offer to buy the Class A stock, but simply invited the holders of the stock to make inquiries.

VI. *The merger of Axton-Fisher.* The charge here is that defendant concealed from plaintiff certain negotiations it had

---

[5] The "changed conditions" obviously uppermost in the minds of investment companies were certain basic facts: (a) The fall of Pearl Harbor in December, 1941; (b) Singapore had been captured on February 15, 1942; (c) Java fell on March 9, 1942; (d) landings had been made on New Guinea on March 12, 1942; and (e) our situation on Bataan and Corregidor was appearing hopeless.

undertaken to merge Axton-Fisher with some other tobacco company. This averment is categorically denied by defendant. It raises what might be called the only substantial issue of fact in the case. Its lack of substantiality is apparent. The fact is Axton-Fisher did not merge with any other company. If it had a vague thought of merging, the non-disclosure of an indefinite intention can have no legal significance.

VII. *Increased value of leaf tobacco inventory of Axton-Fisher.* In view of the legal relations between plaintiff and defendant at the time he sold his stock, as will be discussed fully below, there was no duty on defendant to say anything about the appreciation of leaf tobacco when defendant made its offer, assuming it had knowledge of the fact as asserted by plaintiff.

█ VIII. *Axton-Fisher's failure to pay dividends during the last six months of 1942.* This is the last charge of concealment. True, non-payment of dividends by Axton-Fisher may have induced plaintiff to sell his Class A stock; but I fail to understand how such non-payment may constitute a charge of fraudulent concealment by defendant.[6] Courts do not inquire as to the failure to declare a dividend in the absence of fraud, and no such fraud is even here alleged.

### 2. Summary Judgment

█ In Whitaker v. Coleman, 5 Cir., 115 F.2d 305, 306, in speaking of the circumstances under which a motion for summary judgment should be granted, the Court said: "It must appear that there is no *substantial evidence* on it, that is, either that the tendered evidence is in its nature too incredible to be accepted by reasonable minds, or that conceding its truth, it is without legal probative force." From the discussion which has so far occurred, I think it manifest that no genuine issues of fact lurk in the case at bar. Where affidavits controvert unverified averments in a complaint, absent the filing of counter-affidavits, I fail to see how genuine issues of fact are created, within the meaning of Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Such was the view I took in Allen v. R. C. A., D.C., 47 F.Supp. 244, and which finds support in several other circuits and districts. See, Port of Palm Beach Dist. v. Goethals, 5 Cir., 104 F.2d 706; Battista v. Horton, Myers & Raymond, 76 U.S.App.D.C. 1, 128 F.2d 29; Culhane v. Jackson Hardware Co., D.C., 25 F.Supp. 324; Cudahy Packing Co. v. United States, D.C., 37 F.Supp. 563; New York Credit Men's Ass'n v. Chaityn, D.C., 29 F.Supp. 652. See, too, discussion of the "genuine issue" necessary to bar summary judgment in 4 F.R.S. 940-41.

### 3. Discussion of the Law on the Facts

All of the acts of alleged misrepresentation and concealment are bottomed on two legal propositions. First, at the time plaintiff sold his stock to defendant a fiduciary relation existed between them. Second, that Axton-Fisher was an agent of defendant with respect to the acts and statements of Axton-Fisher.

The doctrine of the fiduciary relation is one of the most confused and entangled subjects in corporation law. However, I need not enter into an analysis of the differences in view of the various circuits and states on the question, because the facts of this case conform to the requirements of the application of the law of but a single state.

█ Axton-Fisher, in which both plaintiff and defendant held stock, is a Kentucky corporation. It seems axiomatic that to determine the existence or non-existence of a fiduciary relationship between stockholders inter sese the law of that state must apply.[7] In addition, under the Delaware conflict of laws rule, the law of the place of the wrong determines the quantum of the breach of duty.

---

[6] There is some basis for the non-payment of dividends. On December 31, 1942, Axton-Fisher had deposits of $941,728.43, with short-term notes of $3,075,000. In the face of this substantial income, there existed a deficiency in working capital. To acquire inventories of leaf tobacco necessary to meet sales requirements and to have paid dividends also, it would have been necessary to double the amount of bank loans.

[7] It is the general law that in matters dealing with the internal affairs of corporations or in matters involving the relationship of shareholders inter sese the law of the state of incorporation controls. 2 Beale, Conflict of Laws, Sec. 192.1 et seq. Cf. also Restatement, Conflicts of Law, Sec. 193 et seq. The rationale of the rule is that since all relationships between shareholders are created by the state of incorporation, questions concerning the nature of the relationship created should be de-

Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 233. It would seem that the place of wrong is where the final act occurred which establishes liability. Goodrich, Conflict of Laws, 2d Ed., 222; Restatement, Conflicts of Law, Sec. 377. Under the facts of the case at bar, the offer was accepted and payment was made in Kentucky.

■ No Kentucky case has been cited, and none has been found, which discusses the specific question of whether a majority stockholder, in purchasing stock from a minority stockholder, occupies a fiduciary relationship to the minority stockholder. But, an examination of "all the available data" discloses analogous Kentucky authority. It is the law of that state, for example, that an officer or director may purchase stock from a minority stockholder without being burdened with the obligations of a fiduciary. The only duty imposed upon such an officer or director is to answer fully and fairly any question addressed to him by the stockholder concerning the affairs of the corporation. But the officer or director is under no obligation to volunteer information. Waller v. Hodge, 214 Ky. 705, 283 S.W. 1047; Barth v. Fidelity & Columbia Trust Co., 188 Ky. 788, 224 S.W. 351. Thus, if an officer or director who purchases directly from a minority stockholder does not stand in the position of a fiduciary to the stockholder, a fortiori, a majority stockholder in acquiring stock from a minority stockholder occupies no such position under the broad view found in the Kentucky decisions. The courts of that state have definitely rejected the principles announced by other courts that a director occupies a fiduciary relationship to a minority stockholder when purchasing the latter's shares.[8]

There is another reason why I conclude there was no relationship created here which required disclosure on the part of defendant as majority stockholder. These shares were traded in on the New York Curb Exchange. Trading there is free and open. Only firm "bids" and "offers" are recognized. Moreover, trading on that exchange is policed by the Securities and Exchange Commission in order to insure that it is free and open. Whether a person is a good or poor trader depends in a large measure upon information; and I can see no reason why one trader should be required to furnish information to another trader.[9]

■ Since there was no duty on the part of defendant to volunteer information concerning the affairs of Axton-Fisher, plaintiff's argument that defendant practiced concealment and misrepresentations is beside the mark. I have, nevertheless, carefully examined all the pleadings and affidavits and I am of opinion that defendant is not guilty of such concealment and misrepresentation in any respect.

If plaintiff had made inquiry of defendant and it had failed to answer plaintiff fully and candidly, then even under Kentucky law defendant would be liable. But plaintiff addressed no single question to defendant notwithstanding defendant expressly invited inquiry when it made its offer to buy. And it must not be forgotten that it was not plaintiff who played the active role; it was his investment counsel, "a stocktrader and arbitrageour".

■ Plaintiff finally argues the affidavit of the newsman Grutzer, who received the "hand-out" which was later published and reported inaccurately that defendant owned no Class A stock, raises a genuine issue of fact. The difficulty

termined by reference to the law of that state.

Yet, whether the relationship must be determined by the law of Kentucky, is dependent, in turn, on whether this is the Delaware conflict view. Absent any decisional law on this point, I conclude Delaware would, under such circumstances, examine the general authority on this point and accept that authority as the law of Delaware. Stentor Electric Mfg. Co. v. Klaxon Co,. 3 Cir., 125 F.2d 820; Moyer v. Van-Dye-Way Corporation, 3 Cir., 126 F.2d 339.

My alternate holding is, of course, under the Delaware conflicts rule it would apply the law of the place of wrong;

in either event, the law of Kentucky controls.

[8] The Delaware courts have adopted the same view as Kentucky. Cahall v. Lofland, 12 Del.Ch. 299, 114 A. 224, affirmed 13 Del.Ch. 384, 118 A. 1; DuPont v. DuPont, D.C.Del., 242 F. 98, 136. This is, also, apparently the majority view. See, Fletcher, Cyc. Corporations, § 1168.

[9] Plaintiff's argument that defendant was bound to furnish information relative to the inventory appreciation of Axton-Fisher ignores the fact this information was available upon investigation, and in this case plaintiff's investment counsel was presumably an expert.

with this argument results from plaintiff's inability to show liability on the part of defendant for the misrepresentation—if it be such—of Axton-Fisher because defendant and Axton-Fisher occupied the relation of principal and agent. In the absence of extraordinary circumstances, a court will not disregard the corporate fiction and hold a stockholder liable for the torts of the corporation.[10] Fletcher, Cyc. Corporations, Sec. 41 et seq. There is nothing in the undisputed facts which justifies a determination that Axton-Fisher was acting as agent of defendant.

I am compelled to hold that defendant should have judgment. An order may be submitted.

---

[10] At the time of plaintiff's sale of his shares, defendant owned 56% of the voting stock of Axton-Fisher, none of whose officers, directors or employees had ever worked for defendant or any of its affiliates; and none of the directors of Axton-Fisher owned stock in defendant. The cases which have disregarded the corporate entity contain facts under which the corporation was acting as agent or was simply the alter ego of its majority stockholder.