# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALCON RESEARCH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-1102-KSJM |
| | ) | |
| AURION BIOTECH, INC., | ) | |
| | ) | |
| Defendant, | ) | |
| Counterclaim Plaintiff. | ) | |

## POST-TRIAL OPINION

Date Submitted: January 17, 2025
Date Decided: January 27, 2025

Jon E. Abramczyk, D. McKinley Measley, Elizabeth A. Mullin Stoffer, Jacob M. Perrone, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Monica K. Loseman, John D.W. Partridge, John Turquet Bravard, GIBSON, DUNN & CRUTCHER LLP, Denver, Colorado; Mary Beth Maloney, Jonathan D. Fortney, Mark H. Mixon, Jr., GIBSON, DUNN, CRUTCHER, New York, New York; *Counsel for Plaintiff and Counterclaim Defendant Alcon Research, LLC.*

Richard R. Rollo, Travis S. Hunter, John M. O'Toole, Kevin M. Kidwell, Edmond S. Kim, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Brad D. Sorrels, Jessica A. Hartwell, Joshua A. Manning, WILSON SONSINI GOODRICH & ROSATI P.C., Wilmington, Delaware; *Counsel for Defendant and Counterclaim Plaintiff, Aurion Biotech, Inc.*

**McCORMICK, C.**

Defendant Aurion Biotech, Inc. and one of its Series C Preferred Stockholders, Plaintiff Alcon Research, LLC, are battling over Aurion's planned IPO. Aurion wants to launch the IPO by mid-February 2025. Alcon seeks to block it. Their disagreements boil down to three issues. The first dispute concerns whether Alcon's claims are barred by laches because Alcon waited too long to bring them. The next dispute concerns whether Alcon's Series C consent rights gave Alcon the right to block Aurion's reverse stock split, which Aurion undertook to free authorized shares to sell in the IPO. The last dispute concerns whether Alcon successfully revoked its voting proxy, in which case Alcon can vote its full 40% stake in Aurion. This post-trial decision resolves the first issue and last issue in favor of Alcon and the other issue in favor of Aurion. Alcon's claims are not barred by laches. Aurion did not require Alcon's consent for the reverse stock split. And Alcon successfully revoked the voting proxy.

## I.    FACTUAL BACKGROUND

Trial took place over two days. The record comprises 416 trial exhibits, live testimony from six fact and two expert witnesses, video testimony from three fact witnesses, deposition testimony from eleven fact and two expert witnesses, and thirty-four stipulations of fact. These are the facts as the court finds them after trial.[1]

---

[1] This decision cites to: C.A. No. 2024-1102-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript, Dkts. 189–90 ("Trial Tr."); and stipulated facts set forth in the Parties' Stipulation and Pre-Trial Order, Dkt. 141 ("PTO"). The witnesses were: Jeannette Bankes (Alcon Board designee), Dr. Andrew ElBardissi (Deerfield Board designee), Thomas Hudnall (Alcon Board designee), Gregory Daniel Kunst (Aurion CEO), Dr. William Link (Aurion investor and former Aurion director) (by video deposition), Michiel C. McCarty (Alcon expert), Steven J. Pully (Aurion expert), David Rostov (Aurion CFO) (by video deposition),

## A. The Series C Fundraising Round

Aurion is an early-stage pharmaceutical company. It is pioneering a cell therapy candidate to combat corneal endothelial disease, a prevalent cause of blindness.[2] The therapy has been approved in Japan but awaits FDA approval in the United States.[3] Aurion is set to begin Phase 3 trials later this year.[4]

To fund the development of its cell therapy, Aurion pursued a Series C fundraising round in 2022.[5] Deerfield Management, a venture capital investor specializing in healthcare investments, led Aurion's Series C round.[6] Deerfield negotiated the terms of the Series C financing, which would form the basis of Aurion's negotiations with other Series C investors.[7] Deerfield partner Dr. Andrew ElBardissi "quarterbacked" these negotiations and serves as Deerfield's designee on the Aurion Board of Directors (the "Board").[8] McDermott Will & Emory represented Deerfield in the negotiations.[9] Dr. Bill Link, an early Aurion investor who served on the Board,

---

David Scileppi (Alcon executive and in-house counsel), Jason Weems (Head of Alcon Business Development & Licensing) (by video deposition), and Carlyn S. Williams (Alcon outside counsel). The transcripts of the witnesses' respective depositions are cited using the witnesses' last names and "Dep. Tr."

[2] PTO ¶ 17; Trial Tr. at 261:11–23 (Kunst).

[3] PTO ¶¶ 17–18; Trial Tr. at 261:24–262:11 (Kunst).

[4] Trial Tr. at 262:12–263:12 (Kunst).

[5] *Id.* at 212:12–213:5 (Kunst).

[6] PTO ¶ 20.

[7] Trial Tr. at 176:7–17 (Williams); *id.* at 219:8–16 (Kunst).

[8] *Id.* at 405:7–406:3 (ElBardissi).

[9] *Id.* at 200:1–8 (Williams).

was involved in negotiations for Aurion.[10]  Wilson Sonsini Goodrich & Rosati ("Wilson Sonsini") represented Aurion.[11]

Alcon is the largest eye-care company in the world, focusing on technical advances in treating eye diseases and conditions.[12]  As Deerfield negotiated the Series C financing terms, Alcon conducted its own diligence to assess whether it would invest in the Series C round.[13]  Senior Legal Counsel for Business Development & Licensing, David Scileppi, led the process for Alcon, with help from lead Business Development & Licensing representative Jason Weems and Alcon's outside counsel, Arnold & Porter.[14]  Alcon relied on Deerfield to negotiate most of the terms for the Series C investors.[15]

Deerfield and Aurion agreed to a term sheet in January 2022 (the "Term Sheet").[16]  Those terms were memorialized in a Preferred Stock Purchase Agreement (the "Purchase Agreement"), which the parties signed on April 5, 2022.[17]  The Purchase Agreement obligated Aurion to file an Amended and Restated Certificate of

---

[10] Link Dep. Tr. at 17:3–19:10, 20:8–17, 27:23–28:9.

[11] Trial Tr. at 275:23 (Kunst).

[12] PTO ¶ 11.

[13] Trial Tr. at 467:4–23 (Weems); JX-3 at 3–11; JX-261; JX-262.

[14] Trial Tr. at 127:14–22, 129:13–130:8 (Scileppi).

[15] *Id.* at 467:4–23 (Weems).

[16] JX-10.

[17] JX-168.

Incorporation (the "Charter").[18]   Wilson Sonsini drafted the Charter based on the then-current National Venture Capital Association ("NVCA") form.[19]

The Term Sheet gave investors holding more than one-third of the Series C shares consent rights over certain corporate actions, including any Charter amendment to alter the number of authorized shares, and any purchase, redemption, or acquisition of shares.[20]  The Charter memorialized these rights in Section 3.4 (the "Series C Consent Rights").[21]

The Term Sheet provided that Series C Preferred Shares would be subject to mandatory conversion upon the consummation of a "Qualified IPO," defined as an IPO that results in at least $90 million of gross proceeds and in which shares are sold at a minimum price of $15.04 per share.[22]  The Charter memorialized that term in Section 5.[23]

Although not reflected in the Term Sheet, Deerfield also negotiated the number of authorized shares of Aurion Common Stock in connection with the Series C financing to limit Aurion's headroom for future capital transactions.[24]

---

[18] *Id.* at 7.

[19] *See* JX-301; Trial Tr. at 148:15–17 (Scileppi).

[20] JX-10 at 9.

[21] JX-170 § 3.4.

[22] JX-10 at 8.

[23] JX-170 § 5.1.

[24] JX-11 at 7; JX-13 at 10, 24; JX-16 at 57; JX-248 at 2; Rostov Dep. Tr. at 40:6–41:7.

The Series C financing was intended to secure $110 million for Aurion and would be funded in three tranches.[25] Deerfield agreed to invest $55 million in exchange for 50% of the Series C shares.[26] Alcon agreed to invest $40 million in exchange for approximately 36% of the Series C shares.[27] Several other investors agreed to acquire the remaining Series C shares.[28]

After the initial closing on the first tranche of the Series C investment, the Board comprised six members. Deerfield and Alcon each designated one director.[29] Both Alcon and Deerfield purchased enough shares in the initial closing to entitle them to exercise Series C Consent Rights.[30] But Deerfield did not realize until mid-2023 that Alcon could exercise those rights.[31] In hindsight, Deerfield views Alcon's Series C Consent Rights as a "mistake" it made during the Series C negotiations.[32] Alcon claims that ever since Deerfield realized that Alcon secured consent rights, Deerfield has been attempting to eliminate them. Alcon views the IPO as another ploy to do so.[33]

---

[25] JX-2; JX-168 at 50.

[26] PTO ¶ 20.

[27] *Id.*; JX-168 at 50; Trial Tr. at 130:9–18 (Scileppi).

[28] Trial Tr. at 245:11–12 (Kunst); *id.* at 406:4–11 (ElBardissi).

[29] JX-19 at 1.

[30] PTO ¶¶ 19–20; Trial Tr. at 70:1–14 (Hudnall).

[31] Trial Tr. at 349:15–350:3 (ElBardissi).

[32] *Id.* at 373:7–15 (ElBardissi).

[33] Dkt. 167 ("Alcon Post-Trial Opening Br.") at 16–18.

### B. The Voting Agreement

Just days before the initial closing, Alcon realized it might have a potential accounting issue if it held stock equaling more than 20% of Aurion's voting power.[34] Alcon realized this after "[a]ll other investors had already signed" the Series C financing documents, and Aurion "was chasing [Alcon] for [its] signature pages."[35] Weems spoke with Aurion's CFO, David Rostov, on the Saturday night before the Monday closing "to alert them to the issue."[36] Scileppi then began working with Alcon's attorneys "to try to come up with a solution."[37] Alcon conveyed to the parties that it needed voting flexibility. For its part, Aurion needed to push forward with Alcon's financing because Aurion was "about a month away" from running out of cash.[38]

Alcon would not cross the 20% threshold until the second or third tranche, so Alcon proposed a temporary fix: a covenant in the Purchase Agreement through which the parties agreed to "determine an approach to address" Alcon's accounting issue "after the initial closing so that the initial closing could go forward."[39] The parties memorialized the temporary fix in Section 6.15 of the Purchase Agreement. It states that "Alcon may elect to have any or all securities purchased by Alcon

---

[34] Trial Tr. at 133:1–23 (Scileppi); *id.* at 219:21–220:14 (Kunst).

[35] *Id.* at 133:4–12 (Scileppi); *id.* at 178:22–179:9 (Williams); *id.* at 222:7–24 (Kunst); JX-15 at 1.

[36] Trial Tr. at 134:21–24 (Scileppi).

[37] *Id.*

[38] *Id.* at 218:6–15 (Kunst).

[39] *Id.* at 179:12–180:1 (Williams).

6

hereunder to be in the form of non-voting securities or for such securities to have limitations on voting rights[.]"[40] Alcon's counterparties agreed to take any actions "reasonably necessary" to implement this provision.[41] No one opposed this language.[42]

At trial, ElBardissi testified that Section 6.15 "was critical for Deerfield and the investor syndicate . . . to ensure that Alcon did not have a significant amount of control."[43] But contemporaneous evidence does not support this testimony. Section 6.15 was added to the Purchase Agreement after Deerfield had already signed the deal and agreed to Alcon's $40 million investment. According to Link, no other party to the Purchase Agreement demanded additional consideration in response to Alcon's request to add Section 6.15 to the Purchase Agreement.[44]

In May 2022, Alcon proposed to limit its voting rights by creating a new series of non-voting preferred shares ("Series C-2 Preferred Stock").[45] As the only proposed Series C-2 stockholder, Alcon (and only Alcon) could waive the Series C-2 rights or

---

[40] JX-168 § 6.15.

[41] *Id.*; *see also* Trial Tr. at 135:1–16 (Scileppi) (explaining that the provision reflects Alcon's counterparties' agreement to "do what they could to accommodate Alcon's request at a later time").

[42] *See* Link Dep. Tr. at 34:17–35:15.

[43] Trial Tr. at 118:4–16 (ElBardissi).

[44] Link Dep. Tr. at 34:17–35:15.

[45] JX-24; JX-29.

elect to convert the non-voting shares back to voting shares.[46] This guaranteed Alcon "the optionality" to vote its full stake if Alcon decided to do so.[47]

Alcon first proposed the Series C-2 Preferred Stock transaction to Deerfield's counsel.[48] Deerfield "signed off pretty quickly."[49]

Alcon then reached out to Aurion's counsel regarding the proposed Series C-2 Preferred Stock.[50] Aurion believed the proposal was too complex and countered with two different concepts: a pre-funded warrant, under which Alcon could elect to receive pre-funded voting shares at some point, or a voting proxy.[51]

Alcon informed Aurion that the voting proxy approach was acceptable, and outside counsel for the parties negotiated a Voting Agreement.[52] Section 7.20 of the Voting Agreement granted a "Voting Proxy" to Aurion's CEO or CFO, permitting either to vote any shares Alcon owned in excess of a "Voting Threshold" of 19% of all outstanding shares on an as-converted basis.[53] While in effect, the Voting Proxy would not otherwise "impact any of the rights or votes that were put to Alcon as Series C holders or preferred stockholders."[54] Section 7.20 also required that the shares in

---

[46] JX-30 at 32–33, § 8.

[47] Trial Tr. at 136:2–10 (Scileppi).

[48] *Id.* at 179:22–180:13 (Williams).

[49] *Id.* at 180:14–18 (Williams); *id.* at 136:13–17 (Scileppi).

[50] *Id.* at 180:11–13 (Williams); *see also,* JX-30 at 1.

[51] JX-254; Trial Tr. at 138:4–11 (Scileppi); *id.* at 180:19–181:8 (Williams).

[52] JX-36 at 1–2.

[53] JX-46 § 7.20.

[54] Trial Tr. at 183:5–14 (Williams).

excess of 19% owned by Alcon be voted in a "Neutral Manner," meaning "in the same proportion as the outstanding Series C Preferred Stock of [Aurion] [excluding Alcon's stock] is voted on the relevant matters."[55]   Scileppi and Alcon's outside counsel understood when the parties were negotiating that the Voting Proxy was revocable "because it didn't say that it was irrevocable."[56]

Section 7.8 of the Voting Agreement required the consent of Aurion, the majority of common stockholders, and the Series C holders to amend the Voting Agreement, subject to certain exceptions.[57]

## C.   Events Leading To This Litigation

Before the Board determined to pursue the challenged IPO, Alcon made numerous offers to acquire Aurion or provide additional financing. In early March 2023, Aurion launched an auction to sell itself, which ultimately failed.[58]  During the auction process, Alcon made a bid to buy Aurion, and the Board formed a Special Committee in response.[59]  By June 8, Alcon ended its participation in the auction process.[60]  Alcon also offered, in November 2023, to provide cash to Aurion to allow it to reach regulatory milestones in exchange for the option to purchase Aurion later at

---

[55] JX-46 § 7.20.

[56] Trial Tr. at 184:3–5 (Williams); *see also id.* at 139:18–140:5 (Scileppi).

[57] JX-46 § 7.8.

[58] PTO ¶ 21.

[59] *Id.* at ¶ 22; JX-65.

[60] PTO ¶ 22.

9

a predetermined price.[61]   Negotiations over the option deal continued through October 2024.  Meanwhile, in 2023, Alcon began exploring a possible IPO.[62]

### 1.     The Board Votes To Pursue An IPO.

The Board first voted to pursue an IPO during its quarterly meeting in June 2024.[63]   Aurion CEO Greg Kunst summarized his conversations with investment bankers.[64]  The investment bankers viewed Aurion as a good candidate for an IPO and thought Aurion could achieve its medium and long-term financing goals through an IPO.[65]   Rostov presented a high-level IPO timeline, and counsel from Wilson Sonsini reviewed proposed Resolutions setting the IPO process in motion.[66]   All directors except Alcon's designee voted in favor of the Resolutions.[67]  The Resolutions

---

[61] Trial Tr. at 140:11 (Scileppi).

[62] *Id.* at 53:5–8 (Bankes); *id.* at 91:15–19 (Hudnall); *id.* at 266:14–18, 268:18–23 (Kunst).  Also, Aurion issued a total of $33 million in convertible notes to Deerfield and other investors in July and August 2024.  *Id.* at 247:3–248:11 (Kunst).  Alcon describes the note offers as a "sweetheart deal" because, in the event of a Qualified IPO, the noteholders' outstanding balances will automatically convert into shares of common stock at a 20% discount on the public price.  *Id.* at 145:12–146:15 (Scileppi).  Alcon did not participate in the note financing and says that the deal was structured to disincentivize Alcon from doing so.  *Id.* at 144:9–145:11 (Scileppi).  In response to Aurion's invitation to participate in the note financing, however, Alcon made multiple alternative financing offers that it argues were on superior terms to the note offering, and which Aurion rejected.  JX-172 at 4, 10–13; JX-173; Trial Tr. at 251:6–253:3 (Kunst).  The parties introduced these facts and the details concerning the auction process and proposed option deal for context and color, which is the limited purpose of this footnote.

[63] JX-119.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] Trial Tr. at 59:3–11 (Bankes).

10

empowered the Special Committee to fully negotiate the terms of an IPO or any other financing transaction on the table.[68]

Because the work toward an IPO was done by the Special Committee, Alcon was in the dark on Aurion's progress toward an IPO in the months that followed the June meeting. In July 2024, Alcon's lawyers asserted that Alcon would not consent to any IPO.[69] Alcon's focus otherwise was on the possible option deal, which Alcon had proposed before the June Board meeting. Because Aurion continued to negotiate with Alcon over an option deal after the June Board meeting, Alcon viewed the IPO as an option under consideration but far from inevitable.

### 2. Alcon Revokes The Voting Proxy.

Alcon acquired additional Aurion shares from Link's entity in October 2024.[70] This increased Alcon's stake to approximately 40% of Aurion's shares on an as-converted basis.

On October 4, 2024, Alcon informed Aurion that, effective immediately, it was revoking the Voting Proxy under Section 7.20 of the Voting Agreement so that Alcon could exercise its full voting power.[71] Aurion refused to recognize the revocation.[72]

---

[68] JX-119 at 1.

[69] JX-125.

[70] Link Dep. Tr. at 100:1–8. Link's testimony was generally favorable to Alcon and highly credible. There is nothing to suggest that Link owed Alcon anything as a consequence of this transaction.

[71] JX-148 at 5–6.

[72] Trial Tr. at 228:19–22 (Kunst).

### 3. The Board Moves Forward With The IPO.

On October 14, 2024, Aurion noticed a Board meeting and distributed a draft Registration Statement and proposed Board Resolutions.[73] The Resolutions would delegate authority to management to pursue an IPO and approve Aurion's 2023 audited financial statements.[74]

The October Board meeting was the first meeting since the Board had determined to pursue an IPO in June 2024.[75] The October 14 meeting notice and accompanying materials was the first that Alcon had learned about the IPO status since the June meeting. After the June meeting, Alcon had swapped out one Board designee and appointed another, each of whom were getting up to speed.[76] And although Alcon had asked to place a Board designee on the Special Committee, the Board denied the request.[77]

The Board meeting occurred on October 17, 2024. During the meeting, the Board approved the draft Registration Statement and Resolutions to advance the IPO over the objections of Alcon's Board designees.[78] The draft Registration Statement

---

[73] *Id*. at 78:24–80:19 (Hudnall); JX-151 at 4–6; JX-152.

[74] JX-151.

[75] Trial Tr. at 74:10–24 (Hudnall).

[76] *Id*. at 66:21–67:1, 71:19–72:5 (Hudnall).

[77] *Id*. at 75:1–22 (Hudnall).

[78] *Id*. at 79:12–23 (Hudnall); *id.* at 256:3–7 (Kunst).

shows that Aurion contemplated pursuing an IPO that would meet the requirement of a "Qualified IPO" under the Charter.[79]

On October 18, 2024, Aurion submitted the Board-approved Registration Statement to the U.S. Securities & Exchange Commission and sent Alcon's directors an internal IPO "project tracker" that revealed that Aurion was targeting a January 2025 launch.[80]

The tracker reveals that if Aurion does not complete an IPO by the middle of February, it will have to complete and submit 2024 audited financial statements.[81] The time needed to prepare the 2024 financials would delay the IPO beyond when the Board projected Aurion would run out of cash.[82]

## D. This Litigation

Recall that Section 5.1 of the Charter provided for mandatory conversion of preferred stock upon the occurrence of a Qualified IPO. The effect of the conversion is to exclude a Qualified IPO from the scope of Series C Consent Rights. So, Aurion did not need Alcon's consent to complete a Qualified IPO. But Aurion lacked sufficient authorized shares to sell in an IPO. And the Charter requires Series C Consent to increase the number of authorized shares.

Alcon filed this litigation on October 28, 2024, seeking a declaration that Aurion would need Series C Consent to increase the number of authorized shares to

---

[79] JX-150 at 119.

[80] JX-153 at 1, 252–54.

[81] Trial Tr. at 269:3–270:6 (Kunst).

[82] Dkt. 9 (Counterclaims) ¶ 7.

consummate a Qualified IPO.  Alcon also sought a declaration that it successfully revoked the Voting Proxy.[83]

Aurion filed its Answer and Counterclaims on November 4, 2024.[84]  Aurion asserted laches as an affirmative defense, contending that Alcon was made aware of a possible IPO at the June 2024 Board meeting and delayed in bringing this action until after the IPO process was well underway.[85]

Through its Counterclaims, Aurion sought a declaration that it does not need Series C consent to close a Qualified IPO.  Aurion also sought a declaration that Alcon did not validly revoke the Voting Proxy, the voting limitation found in Section 7.20 remains in effect, and any modification to Section 7.20 must be made in accordance with Section 7.8 of the Voting Agreement.

The parties agreed that this action should proceed on an expedited schedule.[86]

### E.   The Reverse Stock Split

Tacitly conceding that it needed Series C Consent to amend the Charter to increase the number of authorized shares, Aurion abandoned that plan during litigation in favor of another means of securing more headroom in its capital structure—the "Reverse Stock Split."

The Board approved Resolutions authorizing the Reverse Stock Split on December 16, 2024.  The Resolutions stated that "every 1.395 shares of Common

---

[83] Dkt. 1 ¶¶ 87, 94.

[84] Dkt. 8; Dkt. 9.

[85] Dkt. 88 at 43.

[86] Dkt. 14; Dkt. 15.

Stock" were to be "combined . . . into one share of Common Stock" which would be "issued."[87]  All stock certificates representing shares of Common Stock "prior to" the Reverse Stock Split would have to be "promptly surrender[ed] to the Corporation" "in exchange for a certificate" representing new "shares of common stock."[88]  "No fractional shares" would be issued as a result of the Reverse Stock Split.[89]  Instead, "under Section 155 of the [DGCL], [Aurion] shall pay cash equal to the fair value of such fractional interests."[90]

Translated, the split combined all issued shares of Common Stock, which includes both outstanding and treasury shares, into a lesser number of issued shares. Every 1.395 pre-split shares were reclassified into 1 post-split share.[91]  Each post-split share represents a larger percentage ownership of Aurion, resulting in a higher per-share value.  The increased per-share value of the Common Stock resulted in an increase in the conversion price of the Preferred Stock, meaning that each share of Preferred Stock became convertible into fewer shares of Common Stock, but these shares were more valuable, on a per-share basis.  On a post-split basis, therefore, Aurion needed to reserve fewer shares of Common Stock to accomplish full conversion of the Preferred Stock.[92]

---

[87] JX-236 at 1.

[88] *Id.*

[89] *Id.*

[90] *Id.* at 2.

[91] *Id.* at 1.

[92] JX-161 at 9.

15

Stock splits are often accompanied by a corresponding increase or decrease in the number of authorized shares.[93] The Board, however, did not authorize a proportionate reduction in the total number of authorized shares. That was by design.[94] By reducing the number of issued and reserved shares but maintaining the number of authorized shares, the split had the effect of making available millions of shares of authorized and issuable Common Stock for sale in a Qualified IPO.[95]

On December 11, Alcon amended its Complaint seeking a declaration that the Reverse Stock Split violated numerous Series C Consent Rights.[96]

The parties tried their claims on an expedited basis on January 1 and January 14, 2025.[97] The court held closing arguments immediately after the close of evidence on January 14, 2025.[98]

## II.  LEGAL ANALYSIS

The parties raise three issues. First, are Alcon's claims barred by laches? Second, does the Reverse Stock Split or a Qualified IPO implicate Alcon's Series C Consent Rights? Third, does Alcon have the right to vote all of its shares?

---

[93] *See* Trial Tr. at 296:17–21 (McCarty).

[94] *Id.* at 295:8–12 (McCarty).

[95] *Id.*; JX-236.

[96] Dkt. 84. On December 16, Alcon filed a motion for a status quo order to prevent Aurion from consummating the Reverse Stock Split during this litigation (the "Status Quo Motion"). The court rejected the Status Quo Motion in part because Aurion represented that nothing would prevent the court from invalidating the Reverse Stock Split if, after trial, the court found the transaction violated the Series C Consent Rights. *See* Dkt. 89; Dkt. 174 (Oral Arg. Tr.) at 35:8–17.

[97] Dkt. 152; Dkt. 182.

[98] Dkt. 182.

## A.     Laches

Aurion asserts an affirmative defense of laches, arguing that Alcon impermissibly delayed in filing this lawsuit.  To prevail on laches, a defendant must show two elements: "(i) unreasonable delay in bringing a claim by a plaintiff with knowledge" of an infringement of his or her rights, and (ii) "resulting prejudice to the defendant."[99]  When the defendant makes the requisite showing, the plaintiff "will be prevented from enforcing a claim in equity."[100]

Aurion contends that Alcon was made aware of a possible IPO at the June 2024 Board meeting.  In that meeting, all the Board members besides Alcon's designee voted to approve Resolutions concerning the IPO.[101]  Aurion argues Alcon's delay was due in part to its change of Board members.  Aurion further argues that by waiting until the IPO process was well underway to bring this action—after Aurion had already spent millions of dollars on the bankers, financial advisors, and lawyers required to proceed with a Qualified IPO—Alcon prejudiced Aurion.[102]

Aurion overstates the facts.  After Aurion first actively began pursuing an IPO in June, Alcon sought information and raised its consent rights in July.[103]  Alcon was excluded from the Special Committee process concerning the IPO.  And Alcon had no

---

[99] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[100] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016).

[101] *See* JX-119; Trial Tr. at 63:22–64:7 (Bankes); *id.* at 91:15–19 (Hudnall).

[102] Dkt. 166 ("Aurion Post-Trial Opening Br.") at 47.

[103] *See, e.g.*, JX-223 at 1 (email between Alcon's counsel and the Special Committee members); JX-172 at 2–5 (letters between Alcon's and Aurion's counsel).

17

reason to believe that the IPO was inevitable, given that Aurion continued to negotiate the option deal with Alcon. Upon first learning "Aurion was actually moving forward with an IPO" in late September or early October 2024,[104] Alcon attempted to resolve the disagreement out of court.[105] Alcon filed suit only after those efforts failed, within weeks of the Board's approval of the draft Registration Statement. That is not the stuff of laches.

### B. The Series C Consent Rights

Alcon claims that the Reverse Stock Split required its consent under Sections 3.4.2 and 3.4.5 of the Charter. Section 3.4.2 requires Series C Consent to "indirectly" increase the number of authorized shares. Section 3.4.5 requires Series C Consent to "acquire," "purchase," or "redeem" shares. Alcon further argues that Aurion requires its consent under Section 3.4.1 of the Charter amendment because the transaction required amending the Charter. Each of Alcon's arguments fails.

Delaware law applies contract law by analogy when enforcing corporate charters,[106] and principles of contract interpretation therefore govern the court's analysis. Delaware courts follow the objective theory of contracts, giving words "their plain meaning unless it appears that the parties intended a special meaning."[107] In

---

[104] Trial Tr. at 77:11–18 (Hudnall).

[105] *See* JX-178; JX-179; JX-219.

[106] *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010).

[107] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013) (citing *AT & T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008)); *see also Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) ("A contract's construction should be that which would be

18

practice, the objective theory of contracts requires that a court "give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[108]

Interpreting the agreement under Delaware law requires the court to enforce the contract's plain language unless the contract is ambiguous.[109] The court must not read ambiguity into a contract where none exists.[110] "[A] contract is only ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings."[111]

"Since stock preferences are in derogation of the common law, they must be strictly construed."[112] As the Delaware Supreme Court has held:

---

understood by an objective, reasonable third party." (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010))).

[108] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (citing *Salamone*, 106 A.3d at 368).

[109] *Riverside Fund V, L.P. v. Shyamsundar*, 2015 WL 5004906, at *3 (Del. Super. Aug. 17, 2015) ("Absent any ambiguity, the Court should interpret a contract in accordance with the plain meaning of language in the document." (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)); *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 418 (Del. Ch. 2007) ("[T]he clear, literal meaning of the terms in a legally binding agreement should be given effect when those terms 'establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.'" (quoting *Multi–Fineline Electronix, Inc. v. WBL Corp.*, 2007 WL 431050, at *6 (Del. Ch. Feb. 2, 2007) (citing *Eagle Indus.*, 702 A.2d at 1232), *aff'd*, 945 A.2d 594 (Del. 2008)).

[110] *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) ("[C]reating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.").

[111] *Id.*

[112] *Waggoner v. Laster*, 581 A.2d 1127, 1134 (Del. 1990).

Any rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute. Therefore, these rights, preferences and limitations will not be presumed or implied.[113]

Further, these rules apply without regard to preferred stockholders' appeals to equitable principles. "Equity respects the freedom to contract[.]"[114] "It is not the court's role to rewrite [a] contract between sophisticated market participants . . . to suit the court's sense of equity or fairness. Nor is it the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted differently but in fact did not."[115]

### 1. Section 3.4.2

Alcon argues that the Reverse Stock Split violated Section 3.4.2 of the Charter because it "indirectly" increased the number of authorized shares. Section 3.4.2 states that Aurion

shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, . . . increase or decrease the number of authorized shares of Common Stock . . . .[116]

---

[113] *Elliott Associates, L.P. v. Avatex Corp.*, 715 A.2d 843, 852–3 (Del. 1998).

[114] *Asten, Inc. v. Wangner Sys. Corp.*, 1999 WL 803965, at *6 (Del. Ch. Sept. 23, 1999).

[115] *Exit Strategy, LLC v. Festival Retain Fund BH, L.P.*, 2023 WL 4571932, at *7 (Del. Ch. July 17, 2023), *aff'd*, 326 A.3d 356 (Del. 2024) (internal quotation marks and footnote omitted).

[116] JX-170 § 3.4.2. The NVCA Form has a similar limitation, which requires consent to: "increase the authorized number of shares of Preferred Stock or any additional class or series of capital stock of the Corporation unless the same ranks junior to the Preferred Stock with respect to its rights, preferences and privileges." JX-301 § 3.3.3.

The major problem with Alcon's argument is that the Reverse Stock Split did not increase or decrease the number of authorized shares of Common Stock—either directly or indirectly. Rather, it divided the issued shares by a specific number.[117] Before the Reverse Stock Split, there were 33,185,455 shares of Common Stock authorized under the Charter. After the Reverse Stock Split, there were the exact same number—33,185,455 shares of Common Stock—authorized under the Charter. Alcon concedes this fact.[118]

Alcon argues, nevertheless, that the term "indirectly" is intended to prevent Aurion from undertaking "the functional equivalent" of actions covered by Section 3.4.2.[119] To Alcon, the function of Section 3.4.2 was to fix Aurion's capital structure and prevent all forms of dilution. By increasing the number of available shares, the Reverse Stock Split allows Aurion to dilute Alcon's interests. Alcon thus reasons Aurion required its consent to consummate the split.

Alcon's functional-equivalent argument runs headlong into the doctrine of independent legal significance[120] and principles of contract interpretation governing

---

[117] 1 R. Franklin Balotti & Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporations and Business Organizations* § 8.5 (4th ed. Supp. 2024-2).

[118] *See* Alcon Post-Trial Opening Br. at 37; Trial Tr. at 93:17–21 (Hudnall); *id.* at 157:13–17 (Scileppi); *id.* at 296:13–16 (McCarty).

[119] Alcon Post-Trial Opening Br. at 33–34.

[120] *SIPCA Hldgs. S.A. v. Optical Coating Lab'y, Inc.*, 1997 WL 10263, at *5 (Del. Ch. Jan. 6, 1997) ("[T]he doctrine of independent legal significance holds that legal action authorized under one section of the corporation law is not invalid because it causes a result that would not be achievable if pursued through other action under other provisions of the statute."); *see also Gunderson v. Trade Desk, Inc.*, 326 A.3d 1264,

21

stock preferences.[121]  These two principles combine to force the court to treat different forms of corporate action authorized by the DGCL as independently permissible, regardless of any similarities in their substantive outcomes.  As Vice Chancellor Fioravanti recently explained when applying these doctrines in *Trade Desk*, "[a]n open-ended inquiry into substantively equivalent outcomes, devoid of attention to the formal means by which they are reached, is inconsistent with the manner in which Delaware law approaches issues of transactional validity and compliance with the applicable business entity statute and operative entity documents."[122]

The DGCL distinguishes between an amendment that changes the number of authorized shares and an amendment that divides issued stock into "lesser numbers," which is exactly what a reverse stock split does.[123]  Therefore, a change in authorized

---

1275–79 (Del. Ch. Nov. 8, 2024) (including a scholarly discussion of the doctrine of independent legal significance).

[121] *See, e.g., Waggoner,* 581 A.2d at 1134 (Del. 1990) ("Since stock preferences are in derogation of the common law, they must be strictly construed.").

[122] *Trade Desk*, 326 A.3d at 1285.

[123] *Blades v. Wisehart*, 2010 WL 4638603, at \*10 (Del. Ch. Nov. 17, 2010) ("[I]t is crucial to distinguish an amendment to the certificate of incorporation that merely increases a corporation's authorized but unissued capital stock, as expressly authorized under the first clause of § 242(a)(3), from an amendment that changes the number of outstanding shares, as expressly authorized by the amended language in the last clause of § 242(a)(3) that contemplates a distinct charter amendment that would have the effect of 'subdividing or combining the outstanding shares of any class or series of a class of shares into a greater or lesser number of outstanding shares.'"), *superseded on other grounds by statute* 8 *Del. C.* § 204; *see also* 8 *Del. C.* § 242(d)(2) (differentiating between "[a]n amendment to increase or decrease the authorized number of shares of a class of capital stock" and "an amendment to reclassify by combining the issued shares of a class of capital stock into a lesser number of issued shares of the same class of stock").

22

shares has independent legal significance from a reverse stock split. Strictly construing Section 3.4.2, as the court must, the provision governs only amendments to authorized stock.

The Reverse Stock Split did not require the Series C Consent under Section 3.4.2.

### 2. Section 3.4.5

Alcon newly argues that the Reverse Stock Split implicated the Series C Consent Rights in Section 3.4.5, which states that Aurion:

> shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without . . . the written consent or affirmative vote of the Requisite Series C Holders . . . purchase or redeem . . . or acquire any shares of share capital of this Corporation, other than [exceptions omitted].[124]

Alcon argues that the Reverse Stock Split implicates Section 3.4.5 in two ways: because Aurion both "acquired" shares of Common Stock and "purchased" or "redeemed" fractional shares.[125] Neither argument works.

---

[124] JX-170 § 3.4.5. The NVCA Form uses similar language, prohibiting the company from "purchas[ing] or redeem[ing] . . . any shares of capital stock of the Corporation other than [exceptions omitted]." JX-301 § 3.3.5.

[125] Unlike other places in the Charter, Section 3.4.5 does not refer to stock splits, stock combinations, stock cancellations, stock conversions, or fractional shares. *But see, e.g.,* JX-170 §§ 1.1–5.3. This express mention of relevant transactions in the Charter, and the absence of that language in Section 3.4.5, is likely enough to defeat Alcon's argument. To imply those limitations in Section 3.4.5 would violate the strict rules of construction for preferred stock protective provisions.

23

### a.    No Acquisition

The Charter does not define "acquire."  Alcon adopts the following definitions: "[t]o gain possession or control of; to get or obtain by any means,"[126] or "to come into possession or ownership of."[127]  Alcon argues that Aurion improperly "acquired" shares through the Reverse Stock Split because Aurion gained possession or control of additional shares of Common Stock through the transaction.[128]  To Alcon, the logic is simple: before the Reverse Stock Split, "Aurion did not have enough shares to close a Qualified IPO"; after, it did.[129]  Thus, Alcon argues, Aurion must have "acquired approximately seven million shares of Common Stock available for sale at the IPO that it previously did not possess."[130]

Alcon admits that the Reverse Stock Split did not involve a corporate expenditure.  Relying on the language of Section 160(a) of the DGCL, however, Alcon argues that this does not matter.  Section 160(a) authorizes a corporation to "purchase redeem, receive, take or *otherwise acquire* . . . its own shares[.]"[131]  From this, Alcon concludes that a corporation may "otherwise acquire" assets without purchasing

---

[126] Alcon Post-Trial Opening Br. at 29 (citing Black's Law Dictionary (12th ed. 2024)).

[127] *Id.* (citing Acquire Definition and Meaning, Dictionary.com, https://www.dictionary.com/browse/acquire (last visited Jan. 7, 2025)).

[128] Alcon Post-Trial Opening Br. at 29.

[129] *Id.* at 27.

[130] *Id.* at 34.

[131] 8 *Del. C.* § 160(a) (emphasis added).

them. Alcon argues that Section 3.4.5 tracks the language of Section 160(a), and thus similarly covers purchases, redemptions and "other acquisitions" of Aurion stock.[132]

That is a decent argument, but it fails in the end. The lack of a corporate expenditure is not the issue—there are likely ways to acquire assets without making a corporate expenditure, but the Reverse Stock Split did not have that consequence. The bottom line is that, through the transactional magic of a reverse stock split, Aurion did not acquire any issued shares by operation of the Reverse Stock Split.

From a technical perspective, the Reverse Stock Split was a reclassification of existing shares governed by Section 242 of the DGCL, not an acquisition or repurchase under Section 160 of the DGCL, as Alcon argues.[133] Again, the number of authorized Common Stock shares remained constant throughout the process. The increased head room in Aurion's Common Stock resulted from a reduced number of issued shares relative to the unchanged number of authorized shares and fewer

---

[132] Alcon Post-Trial Opening Br. at 32–33.

[133] It is worth noting that if Section 160 governed reverse stock splits, then reverse stock splits could not be undertaken by corporations that are insolvent or lack surplus. This would be problematic because reverse stock splits are frequently employed by public companies on the verge of insolvency seeking to maintain their stock exchange listing status. *See, e.g.*, SEC Release No. 30-101306 (Oct. 10, 2024), available at https://www.sec.gov/files/rules/sro/nyse/2024/34-101306.pdf (noting that the NYSE "has observed that some companies, typically those in financial distress or experiencing a prolonged operational downturn, engage in a pattern of repeated reverse stock splits" and "believes that such behavior is often indicative of deep financial or operational distress within such companies"); 1 David A. Drexler et al., *Delaware Corporation Law & Practice* § 20.04 (2024) (explaining that "Section 173 distinguishes between stock dividends and stock splits, providing that no such transfer from surplus to capital is necessary in the latter case[,]" such that the creditor protections applicable to a stock dividend are not applicable to stock splits effected by charter amendment).

shares being contractually required to be reserved for issuance upon conversion of the Preferred Stock. The reverse split was not an acquisition as understood under the DGCL, against which this court interprets stock preferences.

The split was also not an acquisition from an accounting perspective. Aurion cites to authority for the proposition that "[n]either unissued shares, treasury shares, nor outstanding rights or options are shown as assets on the books of the corporation."[134] Alcon did not rebut this assertion.

For these reasons, it seems a stretch to construe the Reverse Stock Split as an acquisition. Alcon did not meet its burden of persuasion on this point. Aurion did not "acquire" shares in violation of Section 3.4.5.

### b. No Purchase Or Redemption

Alcon contends that Aurion "purchase[d] or redeem[ed]" shares through the Reverse Stock Split based on the treatment of fractional shares in the transaction.[135]

Where a corporation does not issue fractional shares after a reverse split, Section 155 allows it to "pay in cash the fair value of fractions of a share."[136]

---

[134] Balotti, *supra* note 117, § 5.17, at 5-56, n.312 (4th ed. 2025); *see also Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 941 (Del. 1979) (explaining that a stock split effects "changes in the number of outstanding shares which are unaccompanied by other balance sheet changes: thus a stock split, reverse split or stock dividend changes only the number of shares outstanding without any change in corporate assets"); *cf.* 8 *Del. C.* § 153 (recognizing the difference between an issuance of shares out of authorized but unissued shares and a "disposition" of treasury shares (which, for par value shares, may be issued without the need to receive consideration at least equal to the par value)).

[135] Alcon Post-Trial Opening Br. at 35–36.

[136] 8 *Del. C.* § 155(2).

Corporations that opt to do so must "pay 'fair value' to stockholders who are cashed out for their fractional interest."[137] The Resolution approving the Reverse Stock Split states that "no fractional shares of Common Stock shall be issued in connection with the Reverse Stock Split and instead, pursuant to Section 155 of the [DGCL], [Aurion] shall pay cash equal to the fair value of such fractional interests[.]"[138]

Based on the requirement of Section 155 and the language of the Board resolution, Alcon argues that "any fractional shares of Common Stock existing after the split were returned to Aurion—presumably to be combined into full treasury shares—in exchange for a cash payment from Aurion. Aurion has thus purchased Common Stock shares in exchange for cash payments without Series C Consent."[139]

Alcon's conclusion does not flow from its premise. Aurion did not purchase or redeem fractional shares through the split because Aurion did not issue fractional shares.[140] Rather, where the number of Common Stock shares owned by a holder was not perfectly divisible by 1.395, the fractional overage was canceled and converted into the right to receive equivalent value in cash. Canceling is not

---

[137] *Samuels v. CCUR Hldgs., Inc.*, 2022 WL 1744438, at *4 (Del. Ch. May 31, 2022) (quoting 8 *Del. C.* § 155); *see also Zutrau v. Jansing*, 2014 WL 3772859, at *32 (Del. Ch. July 31, 2014) (noting this type of stock split is one that "compensate[s] stockholders in lieu of issuing fractional shares").

[138] JX-236 at 2.

[139] Alcon Post-Trial Opening Br. at 35.

[140] JX-185 at 3 ("[N]o fractional shares of Common Stock shall be issued in connection with the Reverse Stock Split and instead, pursuant to Section 155 of the Delaware General Corporation Law, the Company shall pay cash equal to the fair value of such fractional interests[.]"); JX-186 at 2 ("No fractional shares of Common Stock shall be issued as a result of the Reverse Stock Split.").

purchasing. The distinction is subtle, but dispositive: Aurion did not purchase or redeem anything.

### 3. Section 3.4.1

Alcon also argues that Aurion needs its consent to consummate a Qualified IPO in all scenarios, regardless of the application of the Series C Consent Rights to the Reverse Stock Split.[141] This is so because, at closing of the planned Qualified IPO, Aurion intends to amend the Charter to include provisions that customarily appear in public company charters, such as a restriction on the stockholders' power to act by written consent.[142] Because Section 3.4.1 of the Charter requires Series C Consent for amendments generally,[143] Alcon argues that its consent is required for a Qualified IPO.

Alcon does not advance this argument whole-heartedly, and for good reason. The argument is illogical in light of the parties' contractual scheme. Section 5 of the Charter governs "Mandatory Conversion." If Aurion required Series C Consent to carry out a Qualified IPO under Section 5.1(a), then the conversion would not be "mandatory."[144]

---

[141] Alcon Post-Trial Opening Br. at 25–26, 29–34.

[142] JX-152 at 77.

[143] JX-170 § 3.4.1.

[144] *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 839 (Del. 2019) ("As we have previously recognized, we must 'give each provision and term effect, so as not to render any part of the contract mere surplusage.'") (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

Moreover, the closing of the Qualified IPO follows a process. First comes the mandatory conversion of the issued Preferred Stock. Second comes the filing of the amended and restated IPO charter. Because all shares of Series C Preferred Stock will have been automatically converted upon the Qualified IPO, no shares will remain outstanding upon the filing and effectiveness of the "IPO charter." Without any Series C Shares outstanding, there is no blocking right to exercise. Thus, the Series C Consent Rights will not apply to a Qualified IPO.[145]

## C. Revocation Of The Voting Proxy

The parties request competing declarations concerning Alcon's ability to vote its full block of shares.[146] Alcon maintains that it revoked the Voting Proxy and can now vote all its shares. Aurion takes the opposite position, arguing the purported revocation is invalid and unenforceable.

Section 7.20 contains the Voting Proxy. It provides:

> Voting Rights. Alcon shall not be permitted to exercise voting rights with respect to any shares of capital stock beneficially owned by Alcon that, in the aggregate,

---

[145] *See generally TCG Secs., Inc. v. Southern Union Co.*, 1990 WL 7525, at *10 (Del. Ch. Jan. 31, 1990) (finding on a motion for a preliminary injunction that protective provisions ceased to apply to a merger when the shares, by redemption, ceased to be outstanding before the effectiveness of the merger, even though the shares were outstanding on the record date); *Greenmont Cap. P'rs I, LP v. Mary's Gone Crackers, Inc.*, 2012 WL 4479999 (Del. Ch. Sept. 28, 2012) (holding that the protective provisions given to the holders of Series B preferred stock (acting as a separate series) did not apply to a charter amendment effected after the mandatory conversion of all outstanding preferred stock because the conversion extinguished the shares of Series B preferred stock, thus eliminating the separate series protective provisions that would have otherwise enabled them to block the later charter amendment).

[146] Aurion Post-Trial Opening Br. at 38–39; Alcon Post-Trial Opening Br. at 25; PTO ¶¶ 58(a), 59(a).

represent voting rights in excess of 19% of the Company's outstanding Common Stock on an as-converted basis (the "**Voting Threshold**") on any matter submitted to vote of all holders of capital stock of the Company. Instead, the Chief Financial Officer or the Chief Executive Officer of the Company then in office, each of them individually, with full power of substitution and resubstitution, shall exercise the voting rights with respect to such shares of capital stock in excess of the Voting Threshold in a Neutral Manner (the "**Voting Proxy**"). "**Neutral Manner**" means in the same proportion as the outstanding Series C Preferred Stock of the Company (excluding any and all capital stock of the Company owned, directly or indirectly, by Alcon) is voted on the relevant matters. For the avoidance of doubt, nothing contained herein shall limit Alcon's ability to vote all shares of capital stock beneficially owned by it on any matter submitted to the holders of Preferred Stock as a class, or any matter submitted to the holders of one or more series of Preferred Stock, voting together as a single class, whether or not such vote is calculated on an as-converted to Common Stock basis, including, without limitation, a vote of the Requisite Series C Holders (as such term may be amended after the date hereof). Alcon and each Investor hereby agree that the implementation of the Voting Proxy hereby satisfies any and all obligations of the Company and the Company's stockholders due under Section 6.15 "Accounting Treatment" of the Purchase Agreement, and that the Company and the Company's stockholders therefore have no remaining obligations to Alcon under such Section of the Purchase Agreement.[147]

Alcon's primary argument under Section 7.20 is straightforward. Delaware courts apply a "presumption against disenfranchisement" requiring "clear and convincing evidence that the contract was intended to restrict" voting.[148] Consistent with this presumption, Delaware law treats a proxy as revocable unless it is expressly

---

[147] JX-46 § 7.20.

[148] *Salamone v. Gorman*, 106 A.3d 354, 371 (Del. 2014).

30

made irrevocable by the principal.[149]  Section 7.20 of the Voting Agreement establishes a voting proxy arrangement by its plain terms.  Section 7.20 is not expressly irrevocable.[150]  Accordingly, Section 7.20 is revocable at Alcon's will.

Aurion responds in three ways.  Aurion first argues that Section 7.20 is not, in fact, a proxy.  It next argues that Section 7.20 is a term of the Voting Agreement and can only be modified in accordance with Section 7.8 of the Voting Agreement, which generally requires the other parties' consent to amend, modify, or terminate its provisions.  It last argues that even if Alcon were able to revoke the Voting Proxy portion of Section 7.20, it would be prohibited, under the remaining portions of Section 7.20, to vote more than 19% of Aurion's fully diluted stock, and further, that Alcon's shares in excess of the 19% threshold must be voted in a "Neutral Manner."[151] Each of these arguments fails.

Aurion's first argument is its weakest.  Aurion argues that Section 7.20 is not a proxy even though the parties called it a Voting Proxy.[152]  As a leading treatise on Delaware law describes, "[t]he proxy relationship is a 'particular sort of agency' in which the stockholder is the principal and the proxy holder is the agent to vote on the shares."[153]  This is what the Voting Proxy does.  Alcon, the principal, grants the agent,

---

[149] *See* 8 *Del. C.* § 212(e); *Eliason v. Englehart*, 733 A.2d 944, 947 (Del. 1999).

[150] JX-46 § 7.20.

[151] Dkt. 135 (Aurion Pre-Trial Br.) at 45.

[152] *See, e.g.*, JX-36 at 1; JX-204 at 2; JX-249 at 2; JX-250 at 4; JX-254; JX-256 at 1.

[153] Edward P. Welch et al., *Folk on the Delaware General Corporation Law, Fundamentals* § 212.03[A], at GCL-688–89 (2020 ed.) (citing *Duffy v. Loft, Inc.*, 151

the CFO or the CEO, the right to vote its shares. Aurion de-emphasizes these facts, arguing that the "identity of the person who implements Alcon's obligation is immaterial" under the Voting Proxy.[154] To Aurion, the only relevant part of the Voting Proxy is Alcon's agreement to have its "excess shares" voted in a Neutral Manner. But this argument ignores many words in Section 7.20, including "Voting Proxy."

Tellingly, Aurion gives its first argument very little attention, citing no authority to support it. It thus seems fair to give the argument equally terse treatment: It flunks. The Voting Proxy is a proxy.

Aurion's second argument rests on Section 7.8 of the Voting Agreement and is stronger, but it falters under the presumption against disenfranchisement. Section 7.8 is titled "Consent Required to Amend, Terminate or Waive." The first sentence of Section 7.8 requires consent from multiple parties (including Aurion) for any amendment, modification, termination or waiver:

> This Agreement may be amended, modified or terminated
> . . . and the observance of any term hereof may be waived
> (either generally or in a particular instance and either
> retroactively or prospectively) only by a written instrument
> executed by (i) [Aurion]; (ii) the holders of a majority of the
> shares of Common Stock issued or issuable upon
> conversion of the shares of Preferred Stock beneficially
> owned by the Investors (voting together as a single class

---

A. 223, 227 (Del. Ch. 1930), *aff'd*, 152 A. 849 (Del. 1930); *Rice & Hutchins, Inc. v. Triplex Shoe Co.*, 147 A. 317, 322 (Del. Ch. 1929), *aff'd*, 152 A. 342 (Del. 1930)).

[154] Aurion Post-Trial Opening Br. at 43–44.

and on an as-converted basis); . . . and (iii) the Requisite Series C Holders.[155]

The second sentence of Section 7.8 begins with "Notwithstanding the foregoing" and is followed by a list of eight subparts providing for additional required consents or exceptions to the first sentence of Voting Agreement Section 7.8. Five of those subparts—(a) and (e) through (h)—identify additional required consents. Three additional subparts—(b), (c), and (d)—identify exceptions to the consents required by the first sentence. To Aurion, the Voting Proxy is a "term" of the agreement and thus subject to Section 7.8. The structure of Section 7.8 suggests that the parties considered each provision of the Voting Agreement carefully to determine when a contractual party could alter obligations under it. Because none of the exceptions cover the Voting Proxy, Alcon required Aurion's consent to revoke it.

In response, Alcon disputes whether the exceptions of Section 7.8 apply, but concludes in the end that it does not matter. To Alcon, Section 7.8 does not govern Section 7.20 because it does not govern "revocation." It could have. The parties knew how to structure an irrevocable proxy. They did so in Section 4.2 of the Voting Agreement, titled "Irrevocable Proxy and Power of Attorney." They did not do so in Section 7.20. And they did not address revocation in Section 7.8.

---

[155] JX-46 § 7.8. "Requisite Series C Holders" is defined as "the holders of at least 66.7% of the shares of Common Stock then issued or issuable upon conversion of the shares of then outstanding shares of Series C Preferred Stock (for the avoidance of doubt, without giving effect to limitations associated with the Voting Threshold)." *Id.* § 3.2.

Alcon has the better side of this argument. The parties did not deem Section 7.20 irrevocable. That seems intentional, given their treatment of Section 7.8. Bolstered by the presumption against disenfranchisement, Alcon's interpretations succeed. Alcon has the authority to revoke the Voting Proxy even if it has not met the requirements of Section 7.8.

The court need not revert to extrinsic evidence to make this determination given the presumption favoring Alcon's interpretation. But the extrinsic evidence supports Alcon's view.

- It was Alcon who requested a solution to the accounting issue days before the initial closing, after the other Series C investors had already signed off on the Purchase Agreement.[156] Alcon's counsel proposed the covenant that became Section 6.15. It states that "*Alcon may elect* to have any or all securities purchased by Alcon hereunder to be in the form of non-voting securities or for such securities to have limitations on voting rights."[157]

- Aurion argues repeatedly that the other Series C investors demanded the Voting Agreement "to ensure that Alcon did not have a significant amount of control."[158] But Aurion relies exclusively on the testimony of ElBardissi, which is not consistent with the contemporaneous evidence. Section 6.15 was added after Deerfield had already signed the deal and agreed to Alcon's $40 million investment.[159]

- When Alcon elected to pursue its rights under Section 6.15, it proposed to Deerfield's counsel a new series of preferred non-voting shares.[160]

---

[156] Trial Tr. at 133:10–24 (Scileppi); *id.* at 222:7–24 (Kunst) ("Alcon raised the issue."); *id.* at 178:24–179:9 (Williams); JX-15 at 1.

[157] JX-168 at 39 (emphasis added).

[158] Trial Tr. at 118:4–16 (ElBardissi); *see also* Aurion Post-Trial Opening Br. at 44.

[159] Trial Tr. at 179:19–180:1 (Williams); *id.* at 135:13–16 (Scileppi); *id.* at 70:15–71:4 (Hudnall).

[160] JX-28; JX-29.

Alcon (and only Alcon) could waive the provision.[161] And any non-voting shares could likewise convert back into voting shares at Alcon's option.[162] This guaranteed Alcon "the optionality" to vote its full stake if Alcon decided to do so.[163] Deerfield "signed off pretty quickly."[164]

- Aurion then responded with two alternative ways to achieve the desired outcome, proposing a pre-funded warrant, under which Alcon could elect to receive pre-funded voting shares at some point, or a voting proxy.[165] Alcon elected the voting proxy approach.[166] No one at Aurion proposed that it be irrevocable. And Section 7.20 does not speak to that issue. As a consequence, Scileppi and Alcon's counsel understood that it was revocable.[167]

This all suggests that it was the parties' intent to allow Alcon to revoke the Voting Proxy. Aurion's second argument thus also falls short.

Aurion's last argument seeks to retain the Neutral-Manner instruction and the Voting Threshold even if the Voting Proxy is revoked. Aurion's argument as to the Neutral-Manner instruction is easily dismissed. The Neutral Manner language gives instructions to Alcon's proxy on how to vote its shares. As a voting instruction to the proxy, it no longer had relevance once the proxy was revoked.[168]

---

[161] JX-30 at 32–33, § 8.

[162] *Id.* at 17–18, § 4.1; Trial Tr. at 136:6–12 (Scileppi); *id.* at 180:2–13 (Williams).

[163] Trial Tr. at 136:6–10 (Scileppi).

[164] *Id.* at 180:14–18 (Williams); *id.* at 136:13–17 (Scileppi).

[165] JX-254; Trial Tr. at 138:4–11 (Scileppi); *id.* at 180:21–181:8 (Williams).

[166] JX-36 at 1–2.

[167] Trial Tr. at 139:18–140:5 (Scileppi); *id.* at 184:3–5 (Williams).

[168] *See In re Appraisal of Dell Inc.*, 143 A.3d 20, 57–58 (Del. Ch. 2016) (finding that the revocation of a voting proxy included the revocation of voting instructions associated with that proxy); *Parshalle v. Roy*, 567 A.2d 19, 28 n.9 (Del. Ch. 1989) (explaining that where a later issued proxy revoked an earlier issued proxy, the voting instructions on the later issued proxy would be operative).

Aurion's argument as to the Voting Threshold is a bit trickier. Aurion argues that the first sentence of Section 7.20 containing the definition of Voting Threshold affirmatively obligates Alcon to refrain from voting shares above the Voting Threshold. It provides: "Alcon shall not be permitted to exercise voting rights with respect to any shares of capital stock . . . in excess of" the Voting Threshold. Section 7.20 establishes the Voting Proxy and the Neutral-Manner instructions in the second sentence. The two sentences serve different purposes, according to Aurion, and should be independently interpreted and enforced.

In seeking to excise the first sentence of Section 7.20 from the remainder of that provision, Aurion ignores the first word in the second sentence: "[i]nstead." That word signals that the two sentences are intended to operate together. That is, the Voting Proxy described in the second sentence of Section 7.20 exists "instead" of or as an alternative to a circumstance where Alcon votes its excess shares. This suggests that if the Voting Proxy is revoked, so too is the Voting Threshold.

Aurion's interpretation also ignores the last sentence of Section 7.20, which states that the provision is intended to satisfy Aurion's obligations under Section 6.15 of the Purchase Agreement.[169] And Section 6.15 itself states that the parties "intend for Alcon to invest in [Aurion] on a basis . . . that does not convey control of [Aurion]

---

[169] JX-46 § 7.20 ("Alcon and each Investor hereby agree that the implementation of the Voting Proxy hereby satisfies any and all obligations of the Company and the Company's stockholders due under Section 6.15 'Accounting Treatment' of the Purchase Agreement, and that the Company and the Company's stockholders therefore have no remaining obligations to Alcon under such Section of the Purchase Agreement.").

36

to Alcon in a manner that would result in Alcon consolidating the financial results of [Aurion] with those of Alcon[.]"[170] Thus, Section 7.20, in its entirety, exists to address Alcon's accounting concerns.

For these reasons, Aurion's proposed interpretation is untenable. The Voting Threshold was eliminated with the revocation of the Voting Proxy.

Alcon and Aurion agree that under Section 7.16, the party whose interpretation of the Voting Agreement prevails is entitled to attorneys' fees.[171] Although Delaware courts generally apply the American Rule that "each party is obligated to pay its own attorneys' fees regardless of the outcome,"[172] "where the parties have determined the allocation of fees by private ordering," "departure from this general rule and deference to their agreement are warranted."[173] Because Alcon has prevailed on the Voting Agreement claim, it is entitled to reasonable attorneys' fees.

## III. CONCLUSION

Judgment will be entered in Aurion's favor with respect to the Reverse Stock Split. Alcon's claims are not barred by laches. Aurion's Charter does not require the

---

[170] JX-168 § 6.15.

[171] Aurion Post-Trial Opening Br. at 45; Alcon Post-Trial Opening Br. at 51 n.14; *see also* JX-46 § 7.16 ("The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled.").

[172] *Thornton v. Lamborn*, 2024 WL 3757903, at *1 (Del. Ch. Aug. 12, 2024) (citing *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966)).

[173] *Aloha Power Co., LLC v. Regenesis Power, LLC*, 2017 WL 6550429, at *5 (Del. Ch. Dec. 22, 2017); *see also LPPAS Representative, LLC v. ATH Hldg. Co., LLC*, 2022 WL 94610, at *7 (Del. Ch. Jan. 10, 2022).

consent of the holders of 66.7% of the outstanding shares of Series C Preferred Stock to complete a Qualified IPO.  Judgment is entered in Alcon's favor with respect to the Voting Proxy.  Alcon has the right to vote its full block of stock, and Alcon is entitled to its attorneys' fees under the Voting Agreement.  To facilitate a prompt appeal, the parties shall submit a form of order implementing this decision within one day.